## UNITED STATES *v.* WHEELER

No. 76–1629.   Argued January 11, 1978—Decided March 22, 1978

314

STEWART, J., delivered the opinion of the Court, in which all other Members joined except BRENNAN, J., who took no part in the consideration or decision of the case.

*Stephen L. Urbanczyk* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Civiletti, Deputy Solicitor General Barnett, Jerome M. Feit,* and *Michael W. Farrell.*

*Thomas W. O'Toole* argued the cause and filed a brief for respondent.

MR. JUSTICE STEWART delivered the opinion of the Court.

The question presented in this case is whether the Double Jeopardy Clause of the Fifth Amendment bars the prosecution of an Indian in a federal district court under the Major Crimes Act, 18 U. S. C. § 1153, when he has previously been convicted in a tribal court of a lesser included offense arising out of the same incident.

I

On October 16, 1974, the respondent, a member of the Navajo Tribe, was arrested by a tribal police officer at the Bureau of Indian Affairs High School in Many Farms, Ariz., on the Navajo Indian Reservation.[1] He was taken to the

_____

[1] The record does not make clear the details of the incident that led

tribal jail in Chinle, Ariz., and charged with disorderly conduct, in violation of Title 17, § 351, of the Navajo Tribal Code (1969). On October 18, two days after his arrest, the respondent pleaded guilty to disorderly conduct and a further charge of contributing to the delinquency of a minor, in violation of Title 17, § 321, of the Navajo Tribal Code (1969). He was sentenced to 15 days in jail or a fine of $30 on the first charge and to 60 days in jail (to be served concurrently with the other jail term) or a fine of $120 on the second.[2]

Over a year later, on November 19, 1975, an indictment charging the respondent with statutory rape was returned by a grand jury in the United States District Court for the District of Arizona.[3] The respondent moved to dismiss this

---

to the respondent's arrest. After the bringing of the federal indictment an evidentiary hearing was held on the respondent's motion to suppress statements he had made to police officers. This hearing revealed only that the respondent had been intoxicated at the time of his arrest; that his clothing had been disheveled and he had had a bloodstain on his face; that the incident had involved a Navajo girl; and that the respondent claimed that he had been trying to help the girl, who had been attacked by several other boys.

[2] The record does not reveal how the sentence of the Navajo Tribal Court was carried out.

[3] The indictment charged that "[o]n or about the 16th day of October, 1974, in the District of Arizona, on and within the Navajo Indian Reservation, Indian Country, ANTHONY ROBERT WHEELER, an Indian male, did carnally know a female Indian . . . not his wife, who had not then attained the age of sixteen years but was fifteen years of age. In violation of Title 18, United States Code, Sections 1153 and 2032."

At the time of the indictment, 18 U. S. C. § 1153 provided in relevant part:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, . . . carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, . . . within the Indian country, shall be subject to the same

indictment, claiming that since the tribal offense of contributing to the delinquency of a minor was a lesser included offense of statutory rape,[4] the proceedings that had taken place in the Tribal Court barred a subsequent federal prosecution. See *Brown* v. *Ohio*, 432 U. S. 161. The District Court, rejecting the prosecutor's argument that "there is not an identity of sovereignties between the Navajo Tribal Courts and the courts of the United States," dismissed the indictment.[5] The Court of Appeals for the Ninth Circuit affirmed the judgment of dismissal, concluding that since "Indian tribal courts and United States district courts are not arms of separate sovereigns," the Double Jeopardy Clause barred the respondent's trial. 545 F. 2d 1255, 1258. We granted certiorari to resolve an intercircuit conflict. 434 U. S. 816.[6]

## II

In *Bartkus* v. *Illinois*, 359 U. S. 121, and *Abbate* v. *United States*, 359 U. S. 187, this Court reaffirmed the well-established

---

laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

The Major Crimes Act has since been amended in respects not relevant here. Indian Crimes Act of 1976, § 2, 90 Stat. 585.

Title 18 U. S. C. § 2032 (1976 ed.), applicable within areas of exclusive federal jurisdiction, punishes carnal knowledge of any female under 16 years of age who is not the defendant's wife by imprisonment for up to 15 years.

[4] The holding of the District Court and the Court of Appeals that the tribal offense of contributing to the delinquency of a minor was included within the federal offense of statutory rape is not challenged here by the Government.

[5] The decision of the District Court is unreported.

[6] In a later case, the Court of Appeals for the Eighth Circuit held that the Double Jeopardy Clause does not bar successive tribal and federal prosecutions for the same offense, expressly rejecting the view of the Ninth Circuit in the present case. *United States* v. *Walking Crow*, 560 F. 2d 386. See also *United States* v. *Elk*, 561 F. 2d 133 (CA8); *United States* v. *Kills Plenty*, 466 F. 2d 240, 243 n. 3 (CA8).

principle that a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one.[7]   The basis for this doctrine is that prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, "subject [the defendant] for the same offence to be twice put in jeopardy":

> "An offence, in its legal signification, means the trans-gression of a law. . . .   Every citizen of the United States is also a citizen of a State or territory.   He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either.   The same act may be an offense or transgression of the laws of both. . . .   That either or both may (if they see fit) punish such an offender, cannot be doubted.   Yet it can-not be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable."   *Moore v. Illinois,* 14 How. 13, 19–20.

It was noted in *Abbate, supra,* at 195, that the "undesirable consequences" that would result from the imposition of a double jeopardy bar in such circumstances further support the

---

[7] Although the problems arising from concurrent federal and state criminal jurisdiction had been noted earlier, see *Houston v. Moore,* 5 Wheat. 1, the Court did not clearly address the issue until *Fox v. Ohio,* 5 How. 410, *United States v. Marigold,* 9 How. 560, and *Moore v. Illinois,* 14 How. 13, in the mid-19th century.   Those cases upheld the power of States and the Federal Government to make the same act criminal; in each case the possibility of consecutive state and federal prosecutions was raised as an objection to concurrent jurisdiction, and was rejected by the Court on the ground that such multiple prosecutions, if they occurred, would not constitute double jeopardy.   The first case in which actual multiple prosecutions were upheld was *United States v. Lanza,* 260 U. S. 377, involving a prosecution for violation of the Volstead Act, ch. 85, 41 Stat. 305, after a conviction for criminal violation of liquor laws of the State of Washington.

"dual sovereignty" concept. Prosecution by one sovereign for a relatively minor offense might bar prosecution by the other for a much graver one, thus effectively depriving the latter of the right to enforce its own laws.[8] While, the Court said, conflict might be eliminated by making federal jurisdiction exclusive where it exists, such a "marked change in the distribution of powers to administer criminal justice" would not be desirable. *Ibid.*

The "dual sovereignty" concept does not apply, however, in every instance where successive cases are brought by nominally different prosecuting entities. *Grafton* v. *United States,* 206 U. S. 333, held that a soldier who had been acquitted of murder by a federal court-martial could not be retried for the same offense by a territorial court in the Philippines.[9] And *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 264–266, reiterated that successive prosecutions by federal and territorial courts are impermissible because such courts are "creations emanating from the same sovereignty." Similarly, in *Waller* v. *Florida,* 397 U. S. 387, we held that a city and the State of which it

---

[8] In *Abbate* itself the petitioners had received prison terms of three months on their state convictions, but faced up to five years' imprisonment on the federal charge. 359 U. S., at 195. And in *Bartkus* the Court referred to *Screws* v. *United States,* 325 U. S. 91, in which the same facts could give rise to a federal prosecution under what are now 18 U. S. C. §§ 242 and 371 (1976 ed.) (which then carried maximum penalties of one and two years' imprisonment) and a state prosecution for murder, a capital offense. "Were the federal prosecution of a comparatively minor offense to prevent state prosecution of so grave an infraction of state law, the result would be a shocking and untoward deprivation of the historic right and obligation of the States to maintain peace and order within their confines." *Bartkus* v. *Illinois,* 359 U. S. 121, 137.

[9] The prohibition against double jeopardy had been made applicable to the Philippines by Act of Congress. Act of July 1, 1902, § 5, 32 Stat. 692. In a previous case, the Court had held it unnecessary to decide whether the Double Jeopardy Clause would have applied within the Philippines of its own force in the absence of this statute. *Kepner* v. *United States,* 195 U. S. 100, 124–125.

is a political subdivision could not bring successive prosecutions for unlawful conduct growing out of the same episode, despite the fact that state law treated the two as separate sovereignties.

The respondent contends, and the Court of Appeals held, that the "dual sovereignty" concept should not apply to successive prosecutions by an Indian tribe and the United States because the Indian tribes are not themselves sovereigns, but derive their power to punish crimes from the Federal Government. This argument relies on the undisputed fact that Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government. *Winton* v. *Amos*, 255 U. S. 373, 391–392; *In re Heff*, 197 U. S. 488, 498–499; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553; *Talton* v. *Mayes*, 163 U. S. 376, 384. Because of this all-encompassing federal power, the respondent argues that the tribes are merely "arms of the federal government" [10] which, in the words of his brief, "owe their existence and vitality solely to the political department of the federal government."

We think that the respondent and the Court of Appeals, in relying on federal control over Indian tribes, have misconceived the distinction between those cases in which the "dual sovereignty" concept is applicable and those in which it is not. It is true that Territories are subject to the ultimate control of Congress,[11] and cities to the control of the State which created them.[12] But that fact was not relied upon as the basis for the decisions in *Grafton, Shell Co.*,[13] and *Waller*.

[10] *Colliflower* v. *Garland*, 342 F. 2d 369, 379 (CA9).

[11] *Binns* v. *United States*, 194 U. S. 486, 491; *De Lima* v. *Bidwell*, 182 U. S. 1, 196–197; *Mormon Church* v. *United States*, 136 U. S. 1, 42; *Murphy* v. *Ramsey*, 114 U. S. 15, 44–45.

[12] *Trenton* v. *New Jersey*, 262 U. S. 182, 187; *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178–179; *Williams* v. *Eggleston*, 170 U. S. 304, 310; *Mount Pleasant* v. *Beckwith*, 100 U. S. 514, 529; see 2 E. McQuillin, Law of Municipal Corporations § 4.03 (3d ed. 1966).

[13] Indeed, in the *Shell Co.* case the Court noted that Congress had

What differentiated those cases from *Bartkus* and *Abbate* was not the extent of control exercised by one prosecuting authority over the other but rather the ultimate source of the power under which the respective prosecutions were undertaken.

*Bartkus* and *Abbate* rest on the basic structure of our federal system, in which States and the National Government are separate political communities. State and Federal Governments "[derive] power from different sources," each from the organic law that established it. *United States* v. *Lanza,* 260 U. S. 377, 382. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each "is exercising its own sovereignty, not that of the other." *Ibid.* And while the States, as well as the Federal Government, are subject to the overriding requirements of the Federal Constitution, and the Supremacy Clause gives Congress within its sphere the power to enact laws superseding conflicting laws of the States, this degree of federal control over the exercise of state governmental power does not detract from the fact that it is a State's own sovereignty which is the origin of its power.[14]

By contrast, cities are not sovereign entities. "Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Reynolds* v. *Sims,* 377 U. S. 533, 575.[15] A city is nothing more than "an agency of

given Puerto Rico "an autonomy similar to that of the states . . . ." 302 U. S., at 262.

[14] Cf. *United States* v. *Lanza,* 260 U. S., at 379–382, holding that a State's power to enact prohibition laws did not derive from the Eighteenth Amendment's provision that Congress and the States should have concurrent jurisdiction in that area, but rather from the State's inherent sovereignty.

[15] See also *Trenton* v. *New Jersey, supra,* at 185–186; *Hunter* v. *Pittsburgh, supra,* at 178; *Worcester* v. *Street R. Co.,* 196 U. S. 539, 548; *Barnes* v. *District of Columbia,* 91 U. S. 540, 544.

the State." *Williams* v. *Eggleston,* 170 U. S. 304, 310. Any power it has to define and punish crimes exists only because such power has been granted by the State; the power "derive[s] . . . from the source of [its] creation." *Mount Pleasant* v. *Beckwith,* 100 U. S. 514, 524. As we said in *Waller* v. *Florida, supra,* at 393, "the judicial power to try petitioner . . . in municipal court springs from the same organic law that created the state court of general jurisdiction."

Similarly, a territorial government is entirely the creation of Congress, "and its judicial tribunals exert all their powers by authority of the United States." *Grafton* v. *United States, supra,* at 354; see *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 317; *United States* v. *Kagama,* 118 U. S. 375, 380; *American Ins. Co.* v. *Canter,* 1 Pet. 511, 542.[16] When a territorial government enacts and enforces criminal laws to govern its inhabitants, it is not acting as an independent political community like a State, but as "an agency of the federal government." *Domenech* v. *National City Bank,* 294 U. S. 199, 204–205.

Thus, in a federal Territory and the Nation, as in a city and a State, "[t]here is but one system of government, or of laws operating within [its] limits." *Benner* v. *Porter,* 9 How. 235, 242. City and State, or Territory and Nation, are not two separate sovereigns to whom the citizen owes separate allegiance in any meaningful sense, but one alone.[17] And the "dual sovereignty" concept of *Bartkus* and *Abbate* does not permit a single sovereign to impose multiple punishment for

---

[16] Indeed, the relationship of a Territory to the Federal Government has been accurately compared to the relationship between a city and a State. *Dorr* v. *United States,* 195 U. S. 138, 147–148, quoting T. Cooley, General Principles of Constitutional Law 164–165 (1880); see *National Bank* v. *County of Yankton,* 101 U. S. 129, 133.

[17] Cf. *Gonzales* v. *Williams,* 192 U. S. 1, 13; *American Ins. Co.* v. *Canter,* 1 Pet. 511, 542.

a single offense merely by the expedient of establishing multiple political subdivisions with the power to punish crimes.

## III

It is undisputed that Indian tribes have power to enforce their criminal laws against tribe members. Although physically within the territory of the United States and subject to ultimate federal control, they nonetheless remain "a separate people, with the power of regulating their internal and social relations." *United States* v. *Kagama, supra,* at 381–382; *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 16.[18] Their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions. *United States* v. *Antelope,* 430 U. S. 641, 643 n. 2; *Talton* v. *Mayes,* 163 U. S., at 380; *Ex parte Crow Dog,* 109 U. S. 556, 571–572; see 18 U. S. C. § 1152 (1976 ed.), *infra,* n. 21. As discussed above in Part II, the controlling question in this case is the source of this power to punish tribal offenders: Is it a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress?

## A

The powers of Indian tribes are, in general, *"inherent powers of a limited sovereignty which has never been extinguished."* F. Cohen, Handbook of Federal Indian Law 122 (1945) (emphasis in original). Before the coming of the Europeans, the tribes were self-governing sovereign political

---

[18] Thus, unless limited by treaty or statute, a tribe has the power to determine tribe membership, *Cherokee Intermarriage Cases,* 203 U. S. 76; *Roff* v. *Burney,* 168 U. S. 218, 222–223; to regulate domestic relations among tribe members, *Fisher* v. *District Court,* 424 U. S. 382; cf. *United States* v. *Quiver,* 241 U. S. 602; and to prescribe rules for the inheritance of property. *Jones* v. *Meehan,* 175 U. S. 1, 29; *United States ex rel. Mackey* v. *Coxe,* 18 How. 100.

communities. See *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 172. Like all sovereign bodies, they then had the inherent power to prescribe laws for their members and to punish infractions of those laws.

Indian tribes are, of course, no longer "possessed of the full attributes of sovereignty." *United States* v. *Kagama, supra,* at 381. Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised.[19] By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others.

But our cases recognize that the Indian tribes have not given up their full sovereignty. We have recently said: "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . . [They] are a good deal more than 'private, voluntary organizations.'" *United States* v. *Mazurie,* 419 U. S. 544, 557; see also *Turner* v. *United States,* 248 U. S. 354, 354–355; *Cherokee Nation* v. *Georgia, supra,* at 16–17. The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status. See *Oliphant* v. *Suquamish Indian Tribe, ante,* p. 191.

B

It is evident that the sovereign power to punish tribal offenders has never been given up by the Navajo Tribe and that tribal exercise of that power today is therefore the con-

---

[19] See *infra,* at 326.

tinued exercise of retained tribal sovereignty. Although both of the treaties executed by the Tribe with the United States [20] provided for punishment by the United States of Navajos who commit crimes against non-Indians, nothing in either of them deprived the Tribe of its *own* jurisdiction to charge, try, and punish members of the Tribe for violations of tribal law. On the contrary, we have said that "[i]mplicit in these treaty terms . . . was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed." *Williams* v. *Lee,* 358 U. S. 217, 221–222; see also *Warren Trading Post* v. *Tax Comm'n,* 380 U. S. 685.

Similarly, statutes establishing federal criminal jurisdiction over crimes involving Indians have recognized an Indian tribe's jurisdiction over its members. The first Indian Trade and Intercourse Act, Act of July 22, 1790, § 5, 1 Stat. 138, provided only that the Federal Government would punish offenses committed *against* Indians by "any citizen or inhabitant of the United States"; it did not mention crimes committed *by* Indians. In 1817 federal criminal jurisdiction was extended to crimes committed within the Indian country by "any Indian, or other person or persons," but "any offence committed by one Indian against another, within any Indian boundary" was excluded. Act of Mar. 3, 1817, ch. 92, 3 Stat. 383. In the Indian Trade and Intercourse Act of 1834, § 25, 4 Stat. 733, Congress enacted the direct progenitor of the General Crimes Act, now 18 U. S. C. § 1152 (1976 ed.), which makes federal enclave criminal law generally applicable to crimes in "Indian country." [21] In this statute Congress car-

---

[20] The first treaty was signed at Canyon de Chelly in 1849, and ratified by Congress in 1850. 9 Stat. 974. The second treaty was signed and ratified in 1868. 15 Stat. 667.

[21] Title 18 U. S. C. § 1152 (1976 ed.) now provides:

"Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place

ried forward the intra-Indian offense exception because "the tribes have exclusive jurisdiction" of such offenses and "we can[not] with any justice or propriety extend our laws to" them. H. R. Rep. No. 474, 23d Cong., 1st Sess., 13 (1834). And in 1854 Congress expressly recognized the jurisdiction of tribal courts when it added another exception to the General Crimes Act, providing that federal courts would not try an Indian "who has been punished by the local law of the tribe." Act of Mar. 27, 1854, § 3, 10 Stat. 270.[22] Thus, far from depriving Indian tribes of their sovereign power to punish offenses against tribal law by members of a tribe, Congress has repeatedly recognized that power and declined to disturb it.[23]

within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulation, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

Despite the statute's broad language, it does not apply to crimes committed by non-Indians against non-Indians, which are subject to state jurisdiction. *United States* v. *McBratney,* 104 U. S. 621.

[22] This statute is not applicable to the present case. The Major Crimes Act, under which the instant prosecution was brought, was enacted in 1885. Act of Mar. 3, 1885, § 9, 23 Stat. 385. It does not contain any exception for Indians punished under tribal law. We need not decide whether this " 'carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land,' " *United States* v. *Antelope,* 430 U. S. 641, 643 n. 1, deprives a tribal court of jurisdiction over the enumerated offenses, since the crimes to which the respondent pleaded guilty in the Navajo Tribal Court are not among those enumerated in the Major Crimes Act. Cf. *Oliphant* v. *Suquamish Indian Tribe, ante,* at 203–204, n. 14.

[23] See S. Rep. No. 268, 41st Cong., 3d Sess., 10 (1870):

"Their right of self government, and to administer justice among themselves, after their rude fashion, even to the extent of inflicting the death penalty, has never been questioned; and . . . the Government has care-

Moreover, the sovereign power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy. *Oneida Indian Nation* v. *County of Oneida,* 414 U. S. 661, 667–668; *Johnson* v. *M'Intosh,* 8 Wheat. 543, 574. They cannot enter into direct commercial or governmental relations with foreign nations. *Worcester* v. *Georgia,* 6 Pet. 515, 559; *Cherokee Nation* v. *Georgia,* 5 Pet., at 17–18; *Fletcher* v. *Peck,* 6 Cranch 87, 147 (Johnson, J., concurring). And, as we have recently held, they cannot try nonmembers in tribal courts. *Oliphant* v. *Suquamish Indian Tribe, ante,* p. 191.

These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status. "[T]he settled doctrine of the law of nations is, that a weaker power does not surrender its independence—its right to self government, by associating with a stronger, and taking its protection." *Worcester* v. *Georgia, supra,* at 560–561.

## C

That the Navajo Tribe's power to punish offenses against tribal law committed by its members is an aspect of its

fully abstained from attempting to regulate their domestic affairs, and from punishing crimes committed by one Indian against another in the Indian country."

retained sovereignty is further supported by the absence of any federal grant of such power. If Navajo self-government were merely the exercise of delegated federal sovereignty, such a delegation should logically appear somewhere. But no provision in the relevant treaties or statutes confers the right of self-government in general, or the power to punish crimes in particular, upon the Tribe.[24]

It is true that in the exercise of the powers of self-government, as in all other matters, the Navajo Tribe, like all Indian tribes, remains subject to ultimate federal control. Thus, before the Navajo Tribal Council created the present Tribal Code and tribal courts,[25] the Bureau of Indian Affairs established a Code of Indian Tribal Offenses and a Court of Indian Offenses for the reservation. See 25 CFR Part 11 (1977); cf. 25 U. S. Ç. § 1311.[26] Pursuant to federal regulations, the present Tribal Code was approved by the Secretary of the Interior before becoming effective. See 25 CFR § 11.1 (e) (1977). Moreover, the Indian Reorganization Act of 1934, § 16, 48 Stat. 987, 25 U. S. C. § 476, and the Act of Apr. 19, 1950, § 6, 64 Stat. 46, 25 U. S. C. § 636, each authorized the Tribe to adopt a constitution for self-government. And the Indian Civil Rights Act of 1968, 82 Stat. 77, 25 U. S. C. § 1302,

---

[24] This Court has referred to treaties made with the Indians as "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *United States* v. *Winans*, 198 U. S. 371, 381.

[25] The tribal courts were established in 1958, and the law-and-order provisions of the Tribal Code in 1959, by resolution of the Navajo Tribal Council. See Titles 7 and 17 of the Navajo Tribal Code; *Oliver* v. *Udall*, 113 U. S. App. D. C. 212, 306 F. 2d 819.

[26] Such Courts of Indian Offenses, or "CFR Courts," still exist on approximately 30 reservations "in which traditional agencies for the enforcement of tribal law and custom have broken down [and] no adequate substitute has been provided." 25 CFR § 11.1 (b) (1977). We need not decide today whether such a court is an arm of the Federal Government or, like the Navajo Tribal Court, derives its powers from the inherent sovereignty of the tribe.

made most of the provisions of the Bill of Rights applicable to the Indian tribes and limited the punishment tribal courts could impose to imprisonment for six months, or a fine of $500, or both.

But none of these laws *created* the Indians' power to govern themselves and their right to punish crimes committed by tribal offenders. Indeed, the Wheeler-Howard Act and the Navajo-Hopi Rehabilitation Act both recognized that Indian tribes already had such power under "existing law." See *Powers of Indian Tribes*, 55 I. D. 14 (1934). That Congress has in certain ways regulated the manner and extent of the tribal power of self-government does not mean that Congress is the source of that power.

In sum, the power to punish offenses against tribal law committed by Tribe members, which was part of the Navajos' primeval sovereignty, has never been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority.[27] It follows that when the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government.[28]

D

The conclusion that an Indian tribe's power to punish tribal offenders is part of its own retained sovereignty is clearly

---

[27] The Department of Interior, charged by statute with the responsibility for "the management of all Indian affairs and of all matters arising out of Indian relations," 25 U. S. C. § 2, clearly is of the view that tribal self-government is a matter of retained sovereignty rather than congressional grant. Department of the Interior, Federal Indian Law 398 (1958); *Powers of Indian Tribes*, 55 I. D. 14, 56 (1934). See also 1 Final Report of the American Indian Policy Review Commission 99–100, 126 (1977).

[28] By emphasizing that the Navajo Tribe never lost its sovereign power to try tribal criminals, we do not mean to imply that a tribe which was deprived of that right by statute or treaty and then regained it by Act of Congress would necessarily be an arm of the Federal Government. That interesting question is not before us, and we express no opinion thereon.

reflected in a case decided by this Court more than 80 years ago, *Talton* v. *Mayes,* 163 U. S. 376. There a Cherokee Indian charged with murdering another Cherokee in the Indian Territory claimed that his indictment by the Tribe was defective under the Grand Jury Clause of the Fifth Amendment. In holding that the Fifth Amendment did not apply to tribal prosecutions, the Court stated:

> "The case . . . depends upon whether the powers of local government exercised by the Cherokee nation are Federal powers created by and springing from the Constitution of the United States, and hence controlled by the Fifth Amendment to that Constitution, or whether they are local powers not created by the Constitution, although subject to its general provisions and the paramount authority of Congress. The repeated adjudications of this Court have long since answered the former question in the negative. . . .
>
> .          .          .          .          .
>
> "True it is that in many adjudications of this court the fact has been fully recognized, that although possessed of these attributes of local self government, when exercising their tribal functions, all such rights are subject to the supreme legislative authority of the United States. . . . But the existence of the right in Congress to regulate the manner in which the local powers of the Cherokee nation shall be exercised does not render such local powers Federal powers arising from and created by the Constitution of the United States." *Id.,* at 382–384.

The relevance of *Talton* v. *Mayes* to the present case is clear. The Court there held that when an Indian tribe criminally punishes a tribe member for violating tribal law, the tribe acts as an independent sovereign, and not as an arm of the Federal Government.[29] Since tribal and federal prosecutions are

---

[29] Cf. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, holding that a

brought by separate sovereigns, they are not "for the same offence," and the Double Jeopardy Clause thus does not bar one when the other has occurred.

## IV

The respondent contends that, despite the fact that successive tribal and federal prosecutions are not "for the same offence," the "dual sovereignty" concept should be limited to successive state and federal prosecutions. But we cannot accept so restrictive a view of that concept, a view which, as has been noted, would require disregard of the very words of the Double Jeopardy Clause. Moreover, the same sort of "undesirable consequences" identified in *Abbate* could occur if successive tribal and federal prosecutions were barred despite the fact that tribal and federal courts are arms of separate sovereigns. Tribal courts can impose no punishment in excess of six months' imprisonment or a $500 fine. 25 U. S. C. § 1302 (7). On the other hand, federal jurisdiction over crimes committed by Indians includes many major offenses. 18 U. S. C. § 1153 (1976 ed.).[30] Thus, when both a federal prosecution for a major crime and a tribal prosecution for a lesser included offense are possible, the defendant will often face the potential of a mild tribal punishment and a federal punishment of substantial severity. Indeed, the respondent in the present case faced the possibility of a federal sentence of 15 years in prison, but received a tribal sentence of no more than 75 days and a small fine. In such a case, the prospect

---

business enterprise operated off the reservation by a tribe was not a "federal instrumentality" free from state taxation.

[30] Federal jurisdiction also extends to crimes committed by an Indian against a non-Indian which have not been punished in tribal court, 18 U. S. C. § 1152 (1976 ed.); see n. 21, *supra,* and to crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer, 18 U. S. C. § 111 (1976 ed.). *Stone* v. *United States,* 506 F. 2d 561 (CA8).

of avoiding more severe federal punishment would surely motivate a member of a tribe charged with the commission of an offense to seek to stand trial first in a tribal court. Were the tribal prosecution held to bar the federal one, important federal interests in the prosecution of major offenses on Indian reservations [31] would be frustrated.[32]

This problem would, of course, be solved if Congress, in the exercise of its plenary power over the tribes, chose to deprive them of criminal jurisdiction altogether. But such a fundamental abridgment of the powers of Indian tribes might be thought as undesirable as the federal pre-emption of state criminal jurisdiction that would have avoided conflict in *Bartkus* and *Abbate*. The Indian tribes are "distinct political communities" with their own mores and laws, *Worcester* v. *Georgia*, 6 Pet., at 557; *The Kansas Indians*, 5 Wall. 737, 756,[33] which can be enforced by formal criminal proceedings in tribal courts as well as by less formal means. They have a significant interest in maintaining orderly relations among their members and in preserving tribal customs and traditions, apart from the federal interest in law and order on the reservation. Tribal laws and procedures are often influenced by tribal

---

[31] See *Keeble* v. *United States*, 412 U. S. 205, 209–212, describing the reasons for enactment of the Major Crimes Act, 18 U. S. C. § 1153 (1976 ed.).

[32] Moreover, since federal criminal jurisdiction over Indians extends as well to offenses as to which there is an independent federal interest to be protected, see n. 30, *supra*, the Federal Government could be deprived of the power to protect those interests as well.

[33] " 'Navaho' is not their own word for themselves. In their own language, they are *diné*, 'The People.' . . . This term is a constant reminder that the Navahos still constitute a society in which each individual has a strong sense of belonging with the others who speak the same language and, by the same token, a strong sense of difference and isolation from the rest of humanity." C. Kluckhohn & D. Leighton, The Navaho 23 (Rev. ed. 1974).

custom and can differ greatly from our own. See *Ex parte Crow Dog*, 109 U. S., at 571.[34]

Thus, tribal courts are important mechanisms for protecting significant tribal interests.[35] Federal pre-emption of a tribe's jurisdiction to punish its members for infractions of tribal law would detract substantially from tribal self-government, just as federal pre-emption of state criminal jurisdiction would trench upon important state interests. Thus, just as in *Bartkus* and *Abbate,* there are persuasive reasons to reject the respondent's argument that we should arbitrarily ignore the settled "dual sovereignty" concept as it applies to successive tribal and federal prosecutions.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

---

[34] Traditional tribal justice tends to be informal and consensual rather than adjudicative, and often emphasizes restitution rather than punishment. See 1 Final Report of the American Indian Policy Review Commission 160–166 (1977); W. Hagan, Indian Police and Judges 11–17 (1966); Van Valkenburgh, Navajo Common Law, 9 Museum of Northern Arizona Notes 17 (1936); *id.,* at 51 (1937); 10 *id.,* at 37 (1938). See generally materials in M. Price, Law and the American Indian 133–150, 712–716 (1973).

[35] Tribal courts of all kinds, including Courts of Indian Offenses, see n. 26, *supra*, handled an estimated 70,000 cases in 1973. 1 Final Report of the American Indian Policy Review Commission 163–164 (1977).