UNITED STATES of America

v.

**Robert GRIMES, Iodis Robinson, Shahid Ali, formerly known as Iodis X. Robinson, Appellant.**

No. 79–1244.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) on Nov. 4, 1980.

Decided Feb. 2, 1981.

Robert J. Del Tufo, U. S. Atty., Mary-anne T. Desmond, Chief, Appeals Division, Asst. U. S. Atty., Newark, N. J., for appel-

lee; Samuel Rosenthal, Asst. U. S. Atty., Newark, N. J., on the brief.

Warren R. Hamilton, Philadelphia, Pa., for appellant.

Before ADAMS and SLOVITER, Circuit Judges, and KNOX, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a district court denial of a 28 U.S.C. § 2255 motion to vacate a criminal conviction and sentence involves a five-pronged attack on both the underlying conviction and twenty year sentence for armed robbery.[1] Appellant, Shahid Ali, has challenged his conviction and sentence on the grounds that (1) he was denied a fair trial because of insufficient access to an adequate legal library; (2) he was unable to conduct his defense competently on account of withdrawal from a prior narcotic addiction; (3) he was refused credit on his federal sentence for the time spent in state custody prior to the federal trial; (4) he was denied credit on his federal sentence for time spent in state custody serving various state sentences imposed after the federal sentence; and (5) successive state and federal prosecutions for the same armed bank robbery violated the Double Jeopardy Clause.

Although we are troubled by the double jeopardy issue, we cannot say that the district court erred in disposing of the appellant's motion, and therefore affirm.

* Honorable William W. Knox, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Two of petitioner's claims involve challenges to the computation of time served on his sentence, rather than attacks on the imposition of sentence, and ordinarily would be cognizable under 28 U.S.C. § 2241, the statute authorizing general habeas corpus relief.

2. This does not moot Ali's double jeopardy attack on the bank robbery conviction and sentence. Noting that most criminal convictions do in fact entail adverse collateral consequences, the Supreme Court has stated that the

## I.

Shahid Ali, formerly known as Iodis X Robinson, was arrested on February 24, 1974 for the robbery of the Llewellyn-Edison Savings and Loan Association of West Orange, New Jersey. It appears that FBI agents as well as Newark police officials interrogated him and that both federal and state authorities thereafter filed charges against him. On March 12, 1974 Ali and a co-defendant, Robert Grimes, were indicted by a federal grand jury for (a) robbing the savings and loan association and (b) putting lives in jeopardy with a dangerous weapon in the course of the robbery, all in violation of 18 U.S.C. § 2113(a) and (d).

Approximately a month later, on April 8, 1974, a state grand jury indicted Ali on a charge of armed robbery of a liquor store. The following week, two more state indictments were returned, charging Ali with the armed robbery of the savings and loan association, the same act which had formed the basis of the federal indictment, and with armed robbery of a second liquor store.

Ali first went to trial in federal court and was convicted by a jury on June 26, 1974 on both § 2113 counts. The district judge sentenced him to a blanket twenty year prison term, and this Court later affirmed the judgment. After imposition of the federal sentence, Ali on December 17, 1974 pleaded guilty to all three state robbery indictments. The state sentences resulted in an aggregate twenty-two and one-half to twenty-four year term of incarceration, with the savings and loan robbery sentence to run concurrently with one of the liquor store robbery sentences.[2]

"existence of concurrent sentences does not remove the elements necessary to create a justiciable case or controversy." *Benton v. Maryland*, 395 U.S. 784, 790, 89 S.Ct. 2056, 2060, 23 L.Ed.2d 707 (1969). The Court cited the use of outstanding convictions in later recidivism prosecutions or in impeaching defendant's testimony at other trials as possible negative consequences.

Present law on the concurrent sentence doctrine does, of course, permit courts in the exercise of their discretion, to decline to reach issues not mooted by the existence of concurrent sentences. *See Barnes v. United States*, 412 U.S. 837, 848 n.16, 93 S.Ct. 2357, 2364, n.16, 37

Persistent attempts have been made by Ali to have his state and federal sentences served concurrently or credited against each other. In May 1976 he wrote the United States Attorney General requesting confinement in a New Jersey state penal facility for service of his federal sentence and simultaneous credit on the federal sentence for time spent in the state institution. Ali also wrote to the district court, in July 1976, seeking similar relief; the district court responded that it had sentenced Ali to a consecutive term. On February 9, 1979, Ali filed a motion for reduction of his federal sentence pursuant to Fed.R.Crim.P. 35, setting forth many of the same contentions raised here. After his Rule 35 motion was denied, Ali brought the present motion under 28 U.S.C. § 2255 to vacate his federal sentence and conviction. Without conducting a hearing, the district court denied the request in a letter opinion dated January 9, 1979. This appeal followed.

Although we affirm the district court's order, we believe it is appropriate to address briefly the merits of Ali's various contentions as well as the underlying issue of the permissibility of successive state-federal prosecutions on which the convictions in question rest.

## II.

■ Ali's first claim, that as a pro se litigant he was denied a fair trial because of inadequate access to legal materials, was fully addressed by the district court. Before the trial the district judge had warned Ali of the hazards of proceeding pro se and had done everything within reason to insure that Ali had access to the lawbooks that were necessary for the preparation of his defense. As described by the district court in denying Ali's motion:

[p]rior to trial, the Court ordered the United States Attorney to provide Ali with an entire set of Title 18 of the United States Code Annotated, including those volumes containing the Federal Rules of Criminal Procedure. The Court also arranged for Ali to have access to the courthouse library before each day's proceedings. Indeed, the Court offered to let Ali use books from the Court's own chambers. The Court also made inquiry into the books available to Ali at the Trenton State Prison where he had been held prior to trial and ordered the Federal Detention Center where he was held during trial to allow Ali full use of its library. Finally, at several points during the proceedings the Court reminded Ali that Mr. Brown was available to do legal research for him.

Ali's motion discloses little that would lead us to question the district court's assessment of the situation—that a prison inmate's constitutional right of access to the courts set forth in *Younger v. Gilmore*,[3] and adumbrated in *Bounds v. Smith*[4] was properly observed here. In light of the trial court's intimate knowledge of the case, we cannot find an abuse of discretion in its failure to grant a hearing on the access issue.

■ Nor do we find that the district court erred in refusing to hold an evidentiary hearing to resolve Ali's contention that his prior narcotics addiction precluded him from competently conducting his defense. The trial court, at a pre-trial hearing, had specifically found Ali to be a "fully competent individual." As the court's letter opinion indicates, Ali did not raise incompetency concerns then or at trial, and "nothing occurred at trial to cast *bona fide* doubts on petitioner's competency to stand trial."

L.Ed.2d 380 (1973). *Cf. Mariscal v. United States*, —— U.S. ——, 101 S.Ct. 909, 66 L.Ed.2d —— · (1981) (remand for reconsideration of applicability of "concurrent sentence" doctrine to conviction conceded by United States to be erroneous).

**3.** 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (state has constitutional obligation to provide law libraries to prisoners).

**4.** 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (requiring prison authorities to assist inmates in preparation of legal papers by provision of libraries or assistance from legally-trained persons).

(App. 3) Ali's case is distinguishable from *Machibroda v. United States*,[5] which involved occurrences outside the courtroom that the judge could not resolve by drawing upon his own knowledge. It is also distinguishable from *Sanders v. United States*, where the allegedly mentally incompetent petitioner appeared before the judge without counsel and "but briefly." 373 U.S. 1, 20, 83 S.Ct. 1068, 1079, 10 L.Ed.2d 148 (1963). In the present case, the trial judge's lengthy exchanges with Ali provide a basis to "conclusively show," as required by § 2255, that the incompetency claim is without merit.

 Careful scrutiny also illuminates flaws in Ali's two arguments relating to the computation of the time that he is to serve under his federal sentence. Ali's insistence that he is being penalized for financial inability to post state bail is in essence a demand that federal bail should have been set and federal custody should have been completed prior to the imposition of state bail and custody. Judicial satisfaction of such a claim, however, would constitute an interference with executive discretion. Insofar as Ali simply seeks credit on his federal sentence for time spent in state custody prior to the federal trial, he must first establish that he has not already received credit on his unrelated state sentences for that time period.[6] Under Federal Prison Bureau Policy, "ordinarily, if a sentence results from the state charges, there will be a presumption that the prisoner did receive credit for presentence time, however, this may be rebutted if the prisoner can demonstrate that the state did not credit the time." Bureau of Prison Policy Statement 5880.24 (Sept. 5, 1979), § 5(c)(2)(a); *Emig v. Bell*, 456 F.Supp. 24, 28 (D.Conn.1978). Ali has not carried that burden, and would have to exhaust state remedies on this point before raising it in federal court, where the proper avenue, should Ali pursue it, would be under 28 U.S.C. § 2241. *Soyka v. Alldredge*, 481 F.2d 303 (3d Cir. 1973).[7]

 Ali's related claim, that he is entitled to federal credit for time spent serving his state sentences, was at most tangentially presented to the district court so that the merits of this contention are not properly before us.[8] Moreover, this claim, like the previous one, is a challenge to the sentence as executed by the prison and parole authorities and should be made on a petition for a writ of habeas corpus, 28 U.S.C. § 2241, not under 28 U.S.C. § 2255 whose terms cover challenges to sentences as imposed. *See Gomori v. Arnold*, 533 F.2d 871 (3d Cir. 1976); *Soyka v. Alldredge*, 481 F.2d 303 (3d Cir. 1973). In any event, this Court's recent holding in *United States v. Campisi*, 622 F.2d 697 (3d Cir. 1980), forecloses Ali's claim in this regard. Campisi, like Ali, asserted that the federal sentence should be deemed to commence immediately after its imposition, at the time the sentenced defendant is returned to the state prison. This Court held that such an interpretation of 18 U.S.C. § 3568 would effec-

---

5. 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962) (28 U.S.C. § 2255 hearing required to determine whether guilty pleas, allegedly induced by promises from the United States Attorney, had been made voluntarily).

6. The case of *United States v. Gaines*, 436 F.2d 1069 (2d Cir. 1971) *vacated and remanded*, 402 U.S. 1006, 91 S.Ct. 2195, 29 L.Ed.2d 428, *on remand*, 449 F.2d 143 (2d Cir. 1971), on which Ali relies, is inapposite. *Gaines*, which dealt with the question of "dead time," held that a prisoner is entitled to have the time served in state custody, because of his inability to post bail, credited against his federal sentence *if* the state charges are subsequently dismissed. 449 F.2d at 144. That clearly is not relevant here, for Ali received an aggregate twenty-two and one-half to twenty-four year state sentence against which the pretrial incarceration could be credited. There is simply no question of a need to eliminate "dead time," which arises only in the absence of a state conviction.

7. Should Ali choose to assert a claim under 28 U.S.C. § 2241, the petition must be filed in the district in which there is jurisdiction over the custodian of the petitioner. *Braden v. Thirtieth Judicial Circuit Court*, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

8. *United States v. Dansker*, 537 F.2d 40, 64 (3d Cir. 1976) (when claim is raised for first time on appeal, without findings crucial to creation of factual predicate for its resolution being sought or made in district court, further consideration is inappropriate).

tively prevent a district court from imposing a term of punishment to be served consecutively to an existing sentence, and would overrule prior decisions by this Court which held that a federal district court "has no power to direct that a federal sentence shall run concurrently with a state sentence." *Gomori v. Arnold*, 533 F.2d 871, 875 (3d Cir.), *cert. denied*, 429 U.S. 851, 97 S.Ct. 140, 50 L.Ed.2d 125 (1976). Since *Gomori* declared that "[t]he rule of presumptive concurrency of sentences . . . does not apply where one sentence is imposed by a federal court and the other by a state court," Ali cannot succeed in demanding what § 3568 prohibits.

### III.

■ A somewhat insecure foundation supports the validity of the conviction which Ali has attacked on the ground of double jeopardy. Ever since *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), in which the Supreme Court held that the Double Jeopardy Clause does not bar a state from prosecuting and convicting a defendant who previously has been tried for the same acts in federal court,[9] courts

have adhered to this proposition as a constitutional command. Yet permitting successive state-federal prosecutions for the same act may be viewed as inconsistent with what is a most ancient principle in western jurisprudence—that the government may not twice place a person in jeopardy for the same offense.[10]

As articulated in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the double jeopardy prohibition secures at least three interests: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Id.* at 717, 89 S.Ct. at 2076.[11] Allowing either a state or the federal government to prosecute an individual after the other jurisdiction has tried him for the same act appears to infringe these three concerns which the Double Jeopardy Clause is designed to protect.[12]

This seeming encroachment on a constitutional right, in the context of concurrent state-federal jurisdiction,[13] has to date been

**9.** In *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), a companion case, the Supreme Court approved the reverse sequence as well—defendants' federal prosecution is not barred under the Double Jeopardy Clause of the Fifth Amendment by their earlier state court conviction for the same acts. The only distinction between the two cases was that in *Bartkus* the defendants were acquitted in federal court prior to the state court conviction; in *Abbate* the defendants pleaded guilty and were sentenced to three months imprisonment in state court before their federal prosecution and conviction.

**10.** *See Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (Black, J., dissenting): "Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times. Even in the Dark Ages, when so many other principles of justice were lost, the idea that one trial and one punishment were enough remained alive through the canon law and the teachings of the early Christian writers. By the thirteenth century it seems to have been firmly established in England, where it came to be considered as a 'universal maxim of the common law.'" *Id.* at 151–53, 79 S.Ct. at 695.

*See also* Westen & Drubel, *Toward a General Theory of Double Jeopardy*, 1978 S.Ct. Rev. 81: "What Blackstone said of double jeopardy in the eighteenth century can be traced to what Demosthenes said 2,000 years earlier: [T]he laws forbid the same man to be tried twice on the same issue." *Id.* at 81.

**11.** For an extended discussion of some of the principles underlying the double jeopardy prohibition see this Court's recent opinion *United States v. Busic and LaRocca*, 639 F.2d 940 (3d Cir. 1981).

**12.** Ali's double jeopardy attack would raise all three concerns if directed against the state prosecution and conviction which occurred after the federal conviction. Given the course of events, the federal sentence only raises the problem of multiple punishment, and the recent case, *United States v. DiFrancesco*, 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 751 (U.S.1980) appears to limit substantially the strength of such claims.

**13.** *Bartkus* and *Abbate* have been criticized as contrary to both common and international law which recognize the pleas of *autrefois acquit* and *autrefois convict*, thus barring reprosecu-

justified by a theory of dual sovereignty.[14] Consequently, what is one act or set of facts becomes two,[15] for such a version of federalism permits the prosecution of the same crime by both the state and federal governments. This construct has been deemed necessary in order to protect arguably separate governmental interests in law enforcement. But a reexamination of *Bartkus* may be in order, since questions may be raised regarding both the validity of this formalistic conception of dual sovereignty and the continuing viability of the opinion's interpretation of the Double Jeopardy Clause with respect to the states. Moreover, the recent expansion of federal criminal law jurisdiction [16] magnifies the impact of *Bartkus* and *Abbate*, thus rendering a reassessment of those decisions timely from a practical standpoint as well.[17]

In *Bartkus*, the petitioner was first tried for robbery of a federally insured savings

and loan association and acquitted in federal court; he was then tried on the same facts and convicted of the robbery in a state court. Justice Frankfurter's opinion for the Court, which sanctioned this double prosecution, appears open to question from two perspectives—one of evolving constitutional principle; one of historical precedent.

First, an important predicate of the *Bartkus* opinion—that the Fifth Amendment Double Jeopardy provision does not bind the states—has been undercut by subsequent constitutional developments. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), unqualifiedly held that the Fifth Amendment Double Jeopardy provision applies to the states. *Benton* thus weakens the theoretical basis of *Bartkus*, namely that states are not bound to follow the federal constitutional interpretation of the Double Jeopardy Clause.[18] The ration-

tion when a defendant has previously been tried by a competent tribunal of another jurisdiction. *See* Note, *Double Prosecution by State and Federal Governments: Another Exercise in Federalism*, 80 Harv.L.Rev. 1538, 1541 (1967); Grant, *The Lanza Rule of Successive Prosecutions*, 32 Colum.L.Rev. 1309, 1316–29 (1932); Franck, *An International Lawyer Looks at the Bartkus Rule*, 34 N.Y.U.L.Rev. 1096 (1959).

**14.** The Supreme Court has recently refused to confine the dual sovereignty concept to state-federal interactions. In *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), the Supreme Court held that the Double Jeopardy Clause did not bar the prosecution of an Indian in federal district court when he had previously been convicted in a tribal court of a lesser included offense arising out of the same incident.

**15.** *See Bartkus v. Illinois*, 359 U.S. at 158, 79 S.Ct. at 699 (Black, J., dissenting).

**16.** *See, e. g., United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (federal prosecution under 18 U.S.C. § 241 after state prosecution for murder); 18 U.S.C. § 1952 (use of interstate commerce for purpose of racketeering) (1976).

**17.** While the Supreme Court has not overturned *Bartkus* it has acknowledged the inherent unfairness of needless, multiple prosecutions. Shortly after *Bartkus*, the Attorney General adopted a federal policy which barred a federal trial following a state prosecution for the same acts "unless the reasons are compel-

ling." (Department of Justice Press Release, Apr. 6, 1959). This federal policy, which also encompasses successive federal prosecutions arising out of the same transaction, was recognized by the Court in *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). More recently, in *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977), the Supreme Court held that a district court had abused its discretion in refusing to grant the government's motion to dismiss the federal indictment after a state court conviction on the grounds that the *Petite* policy had been violated. Although the *Petite* policy is dictated by considerations of fairness to defendants and of efficient and orderly law enforcement, it provides, of course, no respite for defendants, like Ali, who were prosecuted first by federal and then by state authorities.

It is noteworthy, however, that New Jersey has adopted a provision, "Former Prosecution in Another Jurisdiction: When a Bar," L.1978, c. 95, § 2C:1–11, effective September 1, 1979 which prohibits a subsequent prosecution by the state, albeit with a few exceptions, when conduct which constitutes an offense within the concurrent jurisdiction of that state and the United States has previously been prosecuted in district court.

**18.** When clauses in the Bill of Rights have been held applicable to the states the Supreme Court has not distinguished their scope and content when enforcing these rights at the state and federal levels. *See Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

ale of *Benton* also may diminish the practical reasoning underpinning the *Bartkus* opinion: that states are the most competent authorities to deal with the problem of double jeopardy insofar as its proper solution depends on the scope of the ban against reprosecution that has been historically granted in the state. *See* 359 U.S. at 137–38, 79 S.Ct. at 685.

*Benton*, however, does not appear to provide an absolute refutation of *Bartkus*. For *Abbate*, decided the same day as *Bartkus*, held that the federal government, which was undeniably subject to Fifth Amendment limitations, could nevertheless prosecute a defendant despite a prior state prosecution based on the same acts. But *Abbate* itself relied on the proposition that "[t]he Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government, . . . and the double jeopardy therein forbidden is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority." 359 U.S. at 194, 79 S.Ct. at 670, *citing United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). The question becomes, therefore, whether successive federal or successive state proceedings can be validly distinguished from successive federal-state proceedings. And in the wake of *Benton*, which entails the equivalent enforcement of the Double Jeopardy Clause against state and federal governments, any conceptual difference is difficult to support.

In other areas of criminal law—such as compelled testimony—recognition of the applicability of a constitutional right to the states has occasioned a complementary retreat from a rigid doctrine of dual sovereignty. Thus, once *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), determined that the constitutional principle against self-incrimination was applicable to

the states, the holding in *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 57, 79, 84 S.Ct. 1594, 1597, 1609, 12 L.Ed.2d 678 (1964), that one jurisdiction may not constitutionally compel a witness to give testimony which might incriminate him under the laws of another jurisdiction, ineluctably followed. Whenever a constitutional provision is equally enforceable against the state and federal governments, it would appear inconsistent to allow the parallel actions of state and federal officials to produce results which would be constitutionally impermissible if accomplished by either jurisdiction alone.[19] And in noting an interaction of state and federal officials in a "united front against many types of criminal activity." *Murphy* seemed to acknowledge that the institutional interests safeguarded by a system of dual sovereignties had been partially superseded by a structure of cooperative federalism. 378 U.S. at 56, 84 S.Ct. at 1597.

The historical precedents on which Justice Frankfurter relied in *Bartkus* constitute the second possible infirmity in that opinion. Three pre-Civil War cases, *Fox v. Ohio*, 46 U.S. (5 How.) 410, 12 L.Ed. 213 (1847), *United States v. Marigold*, 50 U.S. (9 How.) 560, 13 L.Ed. 257 (1850), and *Moore v. Illinois*, 55 U.S. (14 How.) 13, 14 L.Ed. 306 (1852), provided the crucible in which was forged the theory that permits successive state and federal prosecutions for crimes based upon the same acts. As a matter of legal reasoning such ancient support is problematical, for each of the cases cited was decided prior to the adoption of the Fourteenth Amendment, and, obviously, before the expanded interpretation of that Amendment under *Benton*. Moreover, as a practical matter, these early opinions were incapable of addressing the present reality of a greatly expanded federal criminal law.[20] Closer scrutiny also reveals that *Fox*, and most of its progeny, did not actually involve multiple prosecutions but sim-

---

**19.** *See* Note, *Double Prosecution, supra* n.10, at 1544–47.

**20.** The protective policies of double jeopardy cannot be divorced from the realities of existing criminal procedure. As a noted historian of double jeopardy has commented: "The policy and purpose of double jeopardy must be a

function of the criminal law and procedure of a social system. Double jeopardy, even when established as a general principle, may be empty of specific content." Sigler, *A History of Double Jeopardy*, 7 Am.J.Legal Hist. 283, 309 (1963).

ply raised the question whether both state and federal governments could make the same conduct a crime.[21] And *Moore*, which Justice Frankfurter attributed as the "definitive statement" of the rule on multiple prosecution, quite significantly concerned the validity of state fugitive slave legislation. Given such a politically freighted issue, the Court's statement that a citizen owes allegiance to two sovereigns and may be liable to punishment for an infraction of the laws of either, see 55 U.S. at 20, should be read with considerable caution.[22]

Another source of support for the *Bartkus* holding, *United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), is similarly circumscribed by historical peculiarities. It was not until this 1922 case that the Supreme Court squarely held valid a federal prosecution subsequent to a state prosecution based on the same facts. But *Lanza* is an anomaly from the perspective

of federalism because it involved the Eighteenth (Prohibition) Amendment,[23] which explicitly created concurrent enforcement powers in the state and national governments. Normally, in areas where the federal government is given power to act, its authority, although limited in scope, is paramount. Thus, in criminal matters under its control, the federal government can fully preempt the states. Conversely, and far more customary, where authority remains with the state governments, they are fully responsible for the enforcement of the criminal law. Within such a system, unless one assumes that each government will seek to interfere with the activities of the other, it is quite possible to protect the interests of both governments without resorting to double trials.[24] The Eighteenth Amendment, however, may be regarded as somewhat unique in having established a hybrid terrain—an area of concurrent state and na-

Quite clearly, until the legislature defines an offense, double jeopardy has no substantive ground on which to operate. *Cf. United States v. DiFrancesco*, 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 751 (U.S.1980) (defendant may not receive greater sentence than legislature has authorized). In *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (U.S. 1980), Justice Blackmun, in concurring, stated his view that "the *only* function the Double Jeopardy Clause serves in cases challenging multiple punishments is to prevent the prosecutor from bringing more charges, and the sentencing court from imposing greater punishments, than the Legislative Branch intended." *Id.* at 4409. A constitutional provision, however, is also intended to act as a constraint on legislative action.

**21.** In *Fox*, petitioner had been convicted of passing a counterfeit United States coin in violation of an Ohio State statute. She contended that because the Fifth Amendment prohibited successive state and federal prosecutions, the Court should declare the Ohio statute unconstitutional under the Supremacy Clause in order to preserve the effectiveness of federal law enforcement. In *United States v. Marigold*, 50 U.S. (9 How.) 560, 13 L.Ed. 257 (1850), the Supreme Court affirmed a conviction under the federal counterfeiting statute discussed in *Fox*, admitting that "the same act might constitute an offense against both the State and Federal governments, and might draw to its commission the penalties denounced by either...." 50 U.S. at 569. See also *Bartkus v. Illinois*, 359 U.S. 121, 159 n.25, 79 S.Ct. 676, 699, n.25, 3 L.Ed.2d 684 (1959) (Black, J., dissenting) (citing cases).

**22.** It is noteworthy that another pre-Civil War case, *Ableman v. Booth*, 62 U.S. (21 How.) 506, 507, 16 L.Ed. 169 (1859), which was an important source for the dual sovereignties doctrine (and which held the Fugitive Slave Act of 1850 unconstitutional), has been treated gingerly by later courts. Thus the broad assertion of federal habeas corpus power in *Booth* was restated after the Civil War in *Tarble's Case*, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1872), to avoid reliance on *Booth* with its intimate connections to slavery. Ironically, *Tarble's Case* itself was a questionable decision. The Constitution does not foreclose, nor had Congress legislated against, the right of state courts to inquire into the jurisdiction of a federal court upon habeas corpus.

**23.** The Eighteenth Amendment reads in part: SECTION 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited. SECTION 2. The Congress and the several States shall have *concurrent power* to enforce this article by appropriate legislation. (emphasis added).

**24.** *See Bartkus v. Illinois*, 359 U.S. 121, 157, 79 S.Ct. 676, 698, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). Admittedly, states might have to sacrifice their interest in vigorous enforcement of their recidivist statutes were the federal government to preempt state prosecution of certain crimes.

tional power where the federal government could not, should it desire, assert its supremacy.[25] Extrapolation or generalizations regarding double jeopardy law created in such an unusual context would therefore appear unwarranted.

Although developments in the application of the Bill of Rights to the states, consequent alterations in the system of dual sovereignty, and the historic idiosyncracies of various of the precedents upon which *Bartkus* relies may deprive the opinion of much of its force, we do not believe we are the proper forum to overturn a legal directive from the Supreme Court. The recent holding in *Wheeler v. United States*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), in which the Court continued to subscribe to the dual sovereignty doctrine in the area of double jeopardy, further reinforces our reticence in this regard.

Accordingly, we affirm the order of the district court.

---

**25.** The intention of the leaders of the "dry" lobbies in adding the "concurrent power" clause to the Amendment was clearly to prevent Congress from taking "away from the various states the right to enforce the prohibitory liquor laws of those states." 56 Cong.Rec. 423 (1917). But Chairman Webb, the author of the "concurrent power" clause of the Eighteenth Amendment also noted, "[t]he federal government cannot [prosecute] if the state government does." 56 Cong.Rec. 424 (1917).