# Supreme Court of the Navajo Nation

---

**Navajo Nation, Plaintiff,**
**v.**
**Patrick Platero, Defendant.**
**Decided December 5, 1991**

---

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Vernon J. Roanhorse, Esq., Navajo Legal Aid and Defender Office, Window Rock, Navajo Nation (Arizona), for the defendant; and Timothy Joe, Esq., Virgil Brown, Esq., and Victor J. Clyde, Esq., Navajo Nation Prosecutor's Office, Window Rock, Navajo Nation (Arizona), for the plaintiff.

Opinion delivered by AUSTIN, Associate Justice.

The Navajo Nation filed this petition seeking to have this Court reconsider its order filed on October 15, 1991. That order reversed the judgment of conviction of Patrick Platero for the offense of battery. The reversal is based on our finding, after review of the transcript, that the trial court abused its discretion by refusing to grant Platero's motion for acquittal. We have examined the petition, the applicable parts of the transcript and record, and we find no reason to change our ruling of October 15, 1991.

## I

On March 24, 1989, the Navajo Tribal Council passed a resolution which authorized the termination of Wilbur Kellogg as Chief of the Navajo Police, and recommended the appointment of Major Franklin Morris as the Acting Chief of Police. Leonard Haskie, Interim Chairman of the Navajo Tribal Council, offered the position to Morris, but he refused it. Chairman Haskie then appointed Major George John as the police chief on April 3, 1989. John immediately faced a problem - Kellogg refused to obey his termination orders, and remained in office. On April 5, 1989, John attempted to meet with Kellogg and top command officers (including Platero who was a lieutenant), but Kellogg avoided the meeting. On April 7, 1989, John again unsuccessfully attempted to inform police officers of his appointment. On April 13, 1989, John wrote a memorandum that terminated Platero from his employment as a police officer, for an incident arising from John's April 5, 1989 attempt to inform command officers of his appointment.

The events crucial to this decision happened on April 14, 1989. That morning police officers from around the Navajo Nation assembled in a building called the Old Police Academy, which is at the rear of the Navajo Nation Police and Court Building in Window Rock. Simultaneously, command officers met in the main building. The police officers were preparing for further public demonstrations and a likely confrontation between supporters of suspended Chairman Peter MacDonald Sr. and those in opposition.

At 10:12 a.m., on the morning of April 14, 1989, Lieutenant Daniel Hawkins delivered several employment termination notices, including Platero's, to Major George Waybenais' secretary. Hawkins said that while he usually served termination notices on officers personally, he did not do so then. He and John "felt that it would be safer for myself [Hawkins] not to provoke any type of confrontation, and to leave the packet with the secretary of the Officer in Charge [Waybenais]." Vol. II, Trans. at 74. The prosecution did not present a witness or other evidence during its case-in-chief to show that either the secretary or another person served the termination notice on Platero. In fact, the secretary was not called as a witness at all, and specifically to show what happened to Platero's termination notice after it was placed in her custody.

Meanwhile, John met with tribal officials at the Navajo Nation Department of Justice, and there it was decided that he would meet with the police officers, who were assembled at the academy to inform them of his authority.

John and other tribal officials reached the academy meeting room a little past noon. He went to a podium before the assembled officers, and began to explain his appointment and authority to them. He had spoken only a few minutes when five command officers, including Waybenais, Captain Bobby Edsitty, and Platero entered the room. Waybenais walked up to John, demanded to know his authority for speaking to the officers, and then grabbed him, announcing that he was under arrest. Several witnesses agreed that Waybenais' ground for arrest was that John was impersonating a police officer. Witnesses differed on whether Waybenais directly ordered Platero to complete the arrest, or whether Platero acted spontaneously. Platero put John's left arm behind his back, and pushed him out of the academy entryway. Platero and another officer escorted John into the main police building, and booked him for impersonating a police officer. The charge was later dismissed. When John was asked if he was injured, he replied, "No, I wasn't injured, but I felt a pain. " Vol. III, Trans. at 18.

On the morning of April 14, 1989, and at the time of the incident, Platero was in uniform, and he was with the area and district commanders when they entered the academy meeting room. He and another officer acted as if they were police officers, by marching John into the police station and booking him.

Platero was charged with the offense of battery, 17 N.T.C. § 316(a) (1977), when John filed a criminal complaint against him. The case went to trial before a jury on April 11, 1991, and at the close of the prosecution's case, the defense moved the court to enter a judgment of acquittal. The defense argued that the

prosecution had failed to prove that Platero acted "unlawfully," an essential element of the offense of battery. The motion was denied. Platero was convicted and he appealed that judgment of conviction on June 7, 1991. Platero presented a myriad of issues on appeal. This Court, however, decided to dispose of the appeal using the issue of whether the district court abused its discretion by denying Platero's motion for acquittal, which was based upon the prosecution's failure to prove an element of the offense of battery; namely "unlawfully" striking or using force on another. Based upon our review of the prosecution's case as laid out in the transcript, we ruled for Platero. Our October 15, 1991 order is not based upon Platero's testimony that he did not receive his termination notice or know of his termination until the afternoon following his arrest of John. Further, the order is not influenced by any proceeding in the federal courts. The order is based solely upon an assignment of error that the district court abused its discretion by not granting the motion for acquittal .

## II

Since time immemorial the Navajo people have applied their customs and traditions in dispute resolution. Even with the Navajo Court of Indian Offenses, the Navajo judges of that court, under often adverse circumstances, continued to apply Navajo customs and traditions in cases brought before them. Navajo courts of today are no exception, they apply customs and traditions as the laws of preference. The Navajo Nation Council has legislated that as a requirement. 7 N.T.C. § 204 (1985).

It should come as no surprise that the customs and traditions of the Navajo people have the force of law. They provide a unique body of law known as Navajo common law. *Estate of Belone*, 5 Nav. R. 161, 165 (1987); *Estate of Apachee*, 4 Nav. R. 178, 179-81 (Window Rock D. Ct., 1983). Navajo courts constantly apply Navajo common law in civil cases, and in at least one reported decision, a Navajo trial court applied Navajo common law in a criminal action. *In re Interest of D.P.*, 3 Nav. R. 255 (Crownpoint D. Ct., 1982). The United States Supreme Court has also unanimously confirmed the authority of the Navajo courts to use Navajo common law in criminal cases. *United States v. Wheeler*, 435 U.S. 313, 331-32 (1978). In order to assure Navajo due process, which is fundamental fairness in a Navajo cultural context, we shall apply Navajo common law to this case. The facts of the case require it.

## A

Platero's defense counsel alluded to Navajo common law during jury selection. He said, "Navajo people believe that it is wrong to hurt a person needlessly," and he told the prospective jurors that that was the reason the prosecution must prove its case beyond a reasonable doubt. Vol. I, Trans. at 85. That, restated, means that Platero should not be punished (jailed or fined) unless the prosecution can show

a valid reason for doing so. When Navajos say that it is wrong to hurt a person needlessly, that means that a valid reason for inflicting punishment must be clearly present before actual punishment is inflicted. The reason being that actual coercion or punishment were actions of last resort in Navajo common law. While Navajos would shun a repeat offender, or one who committed a particularly heinous crime, they would not do so unless the act was willful or intentional. Individuals also would not be shunned or punished for good faith acts.

The general Navajo common law principle applicable here is one that protects a person clothed with authority in the exercise of that authority until the person actually knows he or she has been relieved of authority. Specifically, as it relates to Platero, he could not be convicted unless he actually knew he did not have a right to act as a police officer, and obey the command of a superior officer. Thus, the prosecution, in proving the element of unlawfulness, had to make it clear that Platero actually knew he had no police authority, and in spite of that knowledge, he acted to arrest John.

There is nothing in the record to show that Platero actually received his termination notice. Hawkins delivered the termination notices, including Platero's, in a sealed envelope to a secretary about two hours before the incident. On cross-examination by a defense counsel, Hawkins admitted that he did not know whether Platero received his. In fact, Hawkins admitted he bypassed the usual procedure for serving termination notices, by delivering them to a secretary, rather than serving them on the affected individuals himself. Most of the prosecution's proof about Platero's lack of authority focused on the termination notice, but glaringly absent was any direct or circumstantial proof of service of the notice on Platero prior to the arrest incident.

At one point on re-cross examination, when defense counsel was repetitiously pounding the point of a lack of proof of service of the termination notice, asking Hawkins about his knowledge of actual delivery, the court interrupted and observed, "that's what he already answered. He said he didn't know if everybody got served." Vol. II, Trans. at 83. Hawkins was responsible for delivery of the notices, but he did not obtain proof of their service. He could only speculate about service, and offered nothing to show it was made prior to the incident.

The prosecution could have produced the person who delivered the notice to Platero, to testify about when, where, and how it was served. The prosecution did not produce that witness, and that would lead a court to conclude that the testimony of the witness would have been unfavorable to the prosecution. This brings up a point - whether the prosecution suppressed exculpatory evidence by not producing whoever served the notices - but we will not address that here. It is enough to conclude that given the failure of the prosecution to show Platero received actual notice of his termination, the trial judge should have granted the motion for acquittal. The prosecution did not make it clear that Platero did not act as a police officer, or under color of authority.

One witness made an aside remark that Platero had previously "made the

statement he was terminated," Vol. II, Trans. at 25, but the remark had no foundation, and there was no showing it was based on personal knowledge of an admission actually made by Platero. The prosecution now urges the validity of the "admission," but at trial it did not follow up on the remark to show the foundation for it. While an admission against interest is an exception to the hearsay rule, Nav. R. Evid. 26, in criminal matters there must be a foundation for testimony about an admission, showing the circumstances under which the purported admission was made, and personal knowledge of it. An admission against interest must have indicators of reliability. The remark carries little weight.

We will continue to examine criminal records and transcripts for fundamental fairness, applying Navajo common law where appropriate, to protect defendants from abuses. The Navajo Nation Council decided, in 1977, to place the element "unlawful" in the battery statute. The prosecution recognized the element, and proceeded on a theory that Platero did not act lawfully because of his termination. It proved there was a termination notice in existence the day before the incident, and proved delivery of a batch of notices to a secretary two hours before the incident. The prosecution did not prove actual notice, when it could have. We cannot uphold this conviction where there is a failure to prove something so elemental as showing that Platero knew he had no right to act as a police officer.

## B

The Navajo Nation Council did not choose to enact Section 2.12 of the Model Penal Code, which allows a court to dismiss a prosecution for de minimis infractions. However, that power is implicit in 17 N.T.C. § 202(1) (1977), because of what it says on its face. If a criminal prosecution violates a purpose of the Criminal Code, that should be a ground for dismissal. We choose, however, not to usurp prosecutorial authority in applying the de minimis rule. Law enforcement agencies and prosecutors have an inherent power "to ignore merely technical violations of law." 1 American Law Institute, *Model Penal Code and Commentaries* 389-90 (1985).

During the time the public refers to as "the turmoil," the Government of the Navajo Nation was on the brink of collapse. The police command was muddled, because some superior officers chose to be bogged down with politics. Here, the authority of the area commander (Waybenais) was not clear, and the prosecution did not prove Platero was not that person's lawful junior officer. During the defense phase of the trial, John was asked about his three separate attempts to tell his police officers he was in command - on April 5th, 7th, and 14th. When asked, "Were you successful?" John replied, "I was unsuccessful to the point of being arrested." Vol. III, Trans. at 20. That describes the confusion well.

The transcript contains descriptions of the incident as a "near riot," where "everybody jumped" when the area commander announced "you're under arrest!" It was a "scuffle" and "the tension was high." Police officers squared off against each other in a policeman's brawl. John and Waybenais were both sub-

jected to force, and the transcript shows that several officers engaged in an affray. This is not the sort of thing the Navajo courts should have to hear.

Police officers have a certain trust of the people. When they lose sight of their obligations to serve and protect, the safety of the public is compromised, and the public trust is tarnished. The Navajo public definitely expects its police officers to hold themselves to the highest degree of professionalism.

## III

The question of whether the Navajo Nation was entitled to oral argument is moot, because it knew the disposition would be on the record, and did not claim one. It waived oral argument. Furthermore, whether oral argument should be scheduled or not is within the discretion of the Court. In this appeal, the evidence (or lack thereof), was clear from the transcript, and oral argument would have added nothing.

The other ground of the petition, a purported conflict of interest by a member of the staff of the Supreme Court, is not relevant to the issue. We decided there was no conflict of interest at the time of initial review of the appeal. We remind the public that the judges of the Navajo Nation, and not their advisors, make judicial decisions.

Finally, there is no justification for the attacks on the integrity of either the justices of this Court or on a member of the chief justice's staff, which were made in the petition. The conduct of certain attorneys in making these unwarranted attacks, and in handling matters related to this petition, will be dealt with separately.

We hold that, upon reconsideration, our October 15, 1991 order is correct. The conviction of Patrick Platero is reversed and the Window Rock District Court shall enter an order of dismissal, with prejudice.

\* \* \*

TSO, Chief Justice, Concurring.

I join in the opinion of the Court and concur in the ruling. I take this opportunity to identify certain principles which should guide the practitioners and the Court on criminal appeals brought before the Court. I also write separately to show that the same conclusion can be reached in this case using Anglo-American law.

## I. STANDARD OF REVIEW

The legisative history does not indicate the source for the Navajo Criminal Code, but many of its sections appear to be taken, word-for-word, from the American Law Institute's Model Penal Code (Approved May 24, 1962). Where this Court identifies a foreign source for Navajo Nation statutes, it looks to inter-

pretations of the source, as long as they are in accord with the intent of the Navajo Nation Council and the Navajo common law.

## A. STANDARD OF APPELLATE REVIEW OF CRIMINAL JUDGMENTS

An appellate court will not reverse a conviction unless the alleged error was prejudicial. There is prejudicial error if the defect complained of affects substantial rights. If the error is harmless, it will be disregarded. 4 *Wharton's Criminal Procedure* § 643 (1976). An appellate court may also consider errors, whether or not they are raised by the defendant, if any of the following is present: (1) if they are plain and affect substantial rights; (2) if they affect jurisdictional or constitutional rights; (3) if there is lack of subject matter jurisdiction; and (4) if review is necessary to avoid grave injustice. *Id.* at § 640. Where constitutional or quasi-constitutional claims are not involved, the test is "whether, in light of all the admissible evidence (including any defense evidence improperly excluded), the jury's finding of guilt is clearly correct." 3 LaFave & Israel, *Criminal Procedure* pp. 261-62 (1984). These are general standards, but they direct this Court to scrutinize the record and the error complained of to ascertain whether it clearly harmed the defendant, and obviously affected the outcome. In our context, the examination of the record must include an assessment of the overall quality of representation in the prosecution and defense cases.

Here, the Supreme Court has examined the prosecution case on the basis of an assigned error, and on the basis of the statute the defendant was charged with violating - battery.

## B. MOTIONS FOR ACQUITTAL OR DIRECTED VERDICT

The defendant argues that the trial court committed prejudicial error by refusing to grant a judgment of acquittal. The trial judge is responsible, at all phases of a trial, for resolving questions of law. If evidence of a defendant's guilt, measured against the statute, is insufficient, the trial judge must enter a verdict of not guilty. That may be done on the motion of the defendant, or on the court's own motion. 3 Wharton's *Criminal Procedure* § 520 (1975). A motion for acquittal, or directed verdict, will be granted if there is insufficient evidence to support a conviction. *Id.* at p. 431. The test is "whether a reasonable jury, viewing the evidence and reasonable inferences there from in the light most favorable to the prosecution, could find the defendant guilty beyond a reasonable doubt." *Id.* at p. 434; *Navajo Nation v. Murphy*, 6 Nav. R. 10, 15 (1988). This is a question of law, under the control of the judge.

## C. NAVAJO NATION CRIMINAL CODE PRINCIPLES OF CONSTRUCTION

The Navajo Nation Criminal Code is complete in itself, and contains principles of construction for the reading of the offense statutes.

1. Purpose of the Navajo Nation Criminal Code.

The Code states a general purpose: "To proscribe conduct that unjustifiably and inexcusably threatens or inflicts substantial harm to individual or public interests." 17 N.T.C. § 202(1) (1977). This statute comes from Model Penal Code § 1.02(1)(a). The statute means that courts must construe the plain language of the statute, and resolve any doubt as to the meaning of a penal statute in favor of the defendant. *State v. Maguire*, 176 N.J. Super. 164, 422 A.2d 466, 467-68 (1979). While the prosecution must prove each and every element of an offense, that does not include provisions, or matters which are unconnected with the conduct the statute seeks to prevent in its definition. *Commonwealth v. Turner*, 488 A.2d 319, 322 (Pa. Super. 1985) .

The American Law Institute's explanatory note to our statute indicates as follows:

> Within the framework in which the dominant theme is the prevention of offenses, a number of specific factors are articulated which are believed to be the principal objectives of the definitional process. The major goal is to forbid and prevent conduct that threatens substantial harm to individual or public interests and that at the same time is both unjustifiable and inexcusable. Subsidiary themes are to subject those who are disposed to commit crimes to public control, to prevent the condemnation of conduct that is without fault, to give fair warning of the conduct declared to be criminal, and to differentiate between serious and minor offenses on reasonable grounds.

1 American Law Institute, *Model Penal Code and Commentaries* 14 (1985).

These principles require courts to examine the specific definitional elements of the offense within the framework of the evil the statute intends to prevent. As will be discussed in detail, the "unlawful" element of the offense of battery, had to be proved by the prosecution, beyond a reasonable doubt.

2. Proof.

Our statute at 17 N.T.C. § 206 (1977) (MPC § 1.12(1)) provides as follows: "No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt. The innocence of the defendant is presumed." This statute means that while the state has the burden of proving every element of the offense beyond a reasonable doubt, it is not required to anticipate and rebut defenses, including any affirmative defense which does not negate an element of the offense. *Commonwealth v. Shenkin*, 487 A.2d 380, 394 (Pa. Super. 1985). Here, the prosecution had to prove, beyond a reasonable doubt, that the defendant's conduct was "unlawful." The transcript shows that the prosecution proceeded on that understanding.

3. Culpability.

The statute at 17 N.T.C. § 211 (1977) (MPC § 2.02(1)) provides as follows: "A person shall not be guilty of an offense unless he acted intentionally, knowingly, recklessly, or negligently as the law may require with respect to each material element of the offense." Where the mental state required for the crime is

absent, conviction is precluded (although an individual may be convicted of a lesser included offense). *Commonwealth v. Stewart*, 336 A.2d 282, 285 (Pa. 1975). That mental state may be proved by circumstantial evidence. *Commonwealth v. McConnell*, 436 A.2d 1201, 1202 (Pa. Super. 1981). Some offenses require an awareness of certain facts or circumstances. For example, in a prosecution arising out of an assault and battery conviction resulting from a false arrest, the state was required to prove that the arresting officer actually knew the arrest warrant was defective. *See Commonwealth v. Smythe*, 369 A.2d 300, 304 (Pa. Super. 1976); *See also, State v. Moll*, 206 N.J. Super. 257, 502 A.2d 87, 88 (1986).

Here too, the Court must examine the particular statute to see what mental state is required for each element of the offense.

## II. PRINCIPLES APPLIED TO THE OFFENSE OF BATTERY

The offense of battery is set forth in the Navajo Nation Criminal Code as follows: "A person commits battery if he or she unlawfully and intentionally strikes or applies force to the person of another." 17 N.T.C. § 316(a) (1977). The elements of the offense, each of which must be proved beyond a reasonable doubt, are that the defendant must have (1) unlawfully, and (2) intentionally, (3) struck or applied force, (4) to the person of another.

Our battery statute is different from the Model Penal Code section (MPC § 211.1) on assault. The Navajo Nation Council, for reasons not in the legislative history of the Criminal Code, decided to insert an additional element - unlawfully - in its definition of the offense. The Council may have intended to protect law enforcement officers, and others in authority, by requiring that the prosecution prove that any striking or application of force was unlawful. The Criminal Code definition of unlawful is as follows: "'Unlawful' means contrary to law or, where the context so requires, not permitted by law; it does not mean immoral." 17 N.T.C. § 208(25) (1977).

The general rule for police assault and battery cases is, "[a] police officer may use such force as is reasonably necessary in the discharge of his official duties and is not liable for an assault or battery in so doing.... But no greater force can be used than is reasonably necessary for the performance of his duties." 2 *Wharton's Criminal Law* § 186 (1979). Where a police officer acts with reasonable cause, or uses sound discretion under the circumstances, without force which is unreasonably dangerous, there is no assault or battery. *Commonwealth v. Johnson*, 297 F. Supp. 877, 878 (D. Pa. 1969). Where an officer has no motive other than to discharge his duty, and has an honest and reasonable belief that his conduct is necessary in the performance of his duty, a criminal action cannot be maintained against him. *Id.* Also, there is no liability where a public official obeys the lawful command of the government or if an official carries out the

imperative duty of obeying an order of a superior in good faith. 63A Am. Jur. 2d. *Public Officers and Employees* §§ 378-79 (1984).

At this point, discussion of 17 N.T.C. § 215(c) (1977) is appropriate. It states as follows: "Conduct is justified and an affirmative defense when it is required or authorized by law." Normally, the burden would have been on Platero to show that his conduct was required or authorized by law. However, the Navajo Nation Council made "contrary to law" or "not permitted by law" a part of the offense. But for the Council's action in doing so, the burden would have been placed upon Platero. Even if that was done here, the trial court refused to instruct on the affirmative defenses offered by Platero. We cannot ignore the Council's plain instruction, which was probably intended to protect police officers, school teachers, and other persons in authority.

Was Platero a police officer at the time he arrested Major George John? A police officer is a "peace officer," and that "means any person who is a law enforcement officer vested by law with a duty to maintain public order or make arrests, whether that duty extends to all offenses or is limited to specific classes of offenses or offenders." 17 N.T.C. § 208(16) (1977).

Applying the rules of statutory construction to this case, the prosecution had to show that Platero's conduct fell within the statute as the kind of act the law prohibits, and that he was not a law enforcement officer. The gist of the required proof was that the prosecution had to show that Platero was in fact informed he was no longer a peace officer. It had to show that he acted unlawfully as a civilian, and that he then used improper force on Major John. The prosecution failed in its proof. It did not prove actual service of a notice of termination of employment upon Platero; thus, it failed to prove an essential element of the offense beyond a reasonable doubt. The reasonable doubt was there, as a matter of law, because Lt. Daniel Hawkins, the official responsible for service, did not know whether Platero was served. In addition, while the prosecution could have produced the person who made service, to show actual notice, it did not do so.

The record also shows that Platero was following the order of a superior officer, whom several witnesses agreed was in apparent, if not actual, authority. If the arrest was not a lawful one, that was the responsibility of the superior officer. Platero, no doubt, acted in good faith on the order of a superior.

I agree with the Court that the prosecution failed to prove its case beyond a reasonable doubt.