**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven B. FUNMAKER, Defendant–Appellant.**

No. 92–4167.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1993.

Decided Dec. 2, 1993.

Daniel P. Bach, Asst. U.S. Atty., Madison, WI (argued), for U.S.

Jenny Armstrong, Armstrong Law Offices, Madison, WI (argued), Clarence Thomas Belue, Transwestern One, Billings, MT (argued), for Steve B. Funmaker.

Peter M. Lancaster, James E. Townsend, Heather B. Thayer, Dorsey & Whitney, Minneapolis, MN for Wisconsin Winnebago Nation, amicus curiae.

Before EASTERBROOK and MANION, Circuit Judges, and WOOD, JR., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Defendant Steven Bern Funmaker set fire to the Ho Chunk Bingo Hall and Casino at the direction of tribal leaders. As a result, a federal grand jury sitting in the Western District of Wisconsin returned an indictment charging Funmaker with violations of 18 U.S.C. § 844(i), damaging by fire a building involved in interstate commerce, and 18 U.S.C. § 924(c), using a destructive device in connection with a crime of violence. Funmaker pled guilty to both counts of the indictment, reserving his right to appeal a district court order denying his motion to dismiss for lack of subject matter jurisdiction. This appeal ensued.

## I. FACTS

Steven Bern Funmaker is a member of a faction of the Wisconsin Winnebago Indian Tribe aligned with JoAnn Jones (the Jones Faction), Chairperson of the Tribe's Business Committee. An opposing faction, Six Pac, is allied with Jenna Corporation, a supplier of gaming supplies and management services. Jenna Corporation had been furnishing those supplies and services to the Ho Chunk Bingo Hall and Casino, a facility located in Delton, Wisconsin, that the Wisconsin Winnebago Indian Tribe owns and operates. The two factions of the Winnebago Tribe, however, differed over control of the bingo hall, a dispute they took before the United States District Court for the Western District of Wisconsin. The district court ordered Jenna Corporation to remove its property from the bingo hall by 4:30 p.m. on January 26, 1992, and to cease its management services until the approval of a valid services contract.

At 6:00 p.m. on January 26, the Jones Faction discovered Six Pac members and Glenn Corrie, the owner of Jenna Corporation, at the bingo hall after the time to appropriately remain on the premises had expired. The Jones Faction evicted Corrie and the Six Pac members, but soon became worried that Six Pac was organizing an effort to regain control of the bingo hall by force. Members of the Jones Faction, including Funmaker, began guarding the bingo hall.

On January 29, while still standing watch at the bingo hall, the Jones Faction came to believe that Six Pac was congregating at nearby Wisconsin Dells to unlawfully take possession of the bingo hall. Believing they could not hold the bingo hall, at a meeting of the tribal leadership the Jones Faction decided to destroy the building. Funmaker, a member of the "Bear Clan," which historically had acted as the enforcers for the tribe, volunteered to effectuate the decision of the tribal leadership by setting fire to the bingo hall.

Everyone left the bingo hall except Funmaker, who disabled the fire alarm system and spread gasoline throughout the building. Funmaker then ignited the gasoline by using two Molotov cocktails he prepared. Although a sprinkler system in the bingo hall prevented the total destruction of the building, the fire caused damages exceeding $14,000.

State and federal authorities investigated events surrounding the fire, and on March 4, 1992, a federal grand jury sitting in the Western District of Wisconsin returned a two count indictment against Funmaker. Count one charged Funmaker with attempting to destroy by fire a building involved in interstate commerce, in violation of 18 U.S.C. § 844(i). Count two charged Funmaker with using a destructive device in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Funmaker moved to dismiss the indictment for lack of subject matter jurisdiction, and upon the recommendation of a magistrate judge the district court denied the motion on September 2, 1992.

Thereafter, on October 15, 1992, Funmaker pled guilty to both counts of the indictment but reserved his right to appeal the jurisdictional question.[1] On December 18,

---

1. Although Section 844(i) requires malice in the damage to or destruction of property used in or affecting interstate commerce, Funmaker failed to raise the argument before the district court that he acted without malice. Rather, Funmaker

1992, the district court sentenced Funmaker to thirty-three months imprisonment on the Section 844(i) charge, and one day consecutive imprisonment on the Section 924(c) charge. Funmaker filed his notice of appeal on December 24, 1992.

## II. ANALYSIS

Funmaker raises three issues. First, Funmaker claims that his act was an exercise of tribal police power not subject to federal law. Second, Funmaker contends that Congress did not intend to subordinate the police power of the Winnebago tribe to the Organized Crime Control Act of 1970. Finally, Funmaker asserts that federal prosecution of Funmaker violates the political question and act of state doctrines. An understanding of the unique nature of Indian tribal sovereignty is necessary before addressing these issues.

### A.

The "New World": a region in which the Pilgrims sought religious freedom, the British sought resources, and colonists sought political independence. Of course, the area now known as the United States hardly was a new world to the Indian tribes that had inhabited the territory for thousands of years. Those tribes existed as independent political communities long before the Colonies, Great Britain, or their institutions existed, a fact recognized by Chief Justice John Marshall in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832) ("The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial....").

Nevertheless, Indian tribes now are dwarfed by the population of more recent immigrants to the New World. Whether one looks at the federal government's relationship to Indian tribes as one of conqueror, protector, or cohabitant, the indisputable fact remains that for better or worse, the once dominant Indian tribes now exist within, and in some respects subject to, the United States of America. Chief Justice Marshall was quick to note that although Indian tribes never surrendered their independence to the United States, they are not beyond the reach of the federal law. *Id.* at (6 Pet.) 560–61.

What Indian tribes do possess are "*inherent* powers of a limited sovereignty...." Felix S. Cohen, *Handbook of Federal Indian Law* 122 (1948), *quoted in United States v. Wheeler,* 435 U.S. 313, 322, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). That sovereignty allows Indian tribes to regulate their internal affairs, *Roff v. Burney,* 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), and enforce those regulations in their own forums, *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The sovereignty of Indian tribes is limited, however, in that it exists only in the absence of federal law to the contrary. *U.S. Const.* Art. I, § 8, cl. 3 (Congress has power "[t]o regulate Commerce ... with the Indian Tribes"); *Cherokee Nation v. Hitchcock,* 187 U.S. 294, 305–07, 23 S.Ct. 115, 119–20, 47 L.Ed. 183 (1902). For example, in the Major Crimes Act Congress specifically gave federal courts criminal jurisdiction over Indians who commit certain felonies, including murder, kidnapping, and burglary, a provision that has existed in various forms since 1885. *See* 18 U.S.C. § 1153.

Congress, however, does not always act with Indian tribes in mind when it crafts legislation. Rather, Congress may draft laws using general terms that make no reference to Indian tribes. The question then arises whether statutes that fail to address Indian tribes specifically nevertheless encompass the conduct of members of those tribes.

As a general rule, statutes written in terms applying to all persons include members of Indian tribes as well. *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960). An exception, however, follows on the heels of the rule, namely that when the application of a statute would affect Indian or tribal rights recognized by treaty or statute, or would affect rights essential to self-governance of intramural matters, the law specifi-

cally must evince Congressional intent to interfere with those rights. *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 932–34 (7th Cir.1989). As the Ninth Circuit put it:

A federal statute of general applicability that is silent on the issue of applicability to Indian Tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not apply to Indians on their reservations ..." [quoting *United States v. Farris*, 624 F.2d 890, 893–94 (9th Cir.1980) ]. In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them.

*Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir.1985), *quoted in Smart*, 868 F.2d at 933–34. Because 18 U.S.C. § 844(i) and 18 U.S.C. § 924(c) fail to address Indian tribes specifically, we must analyze both the impact on Indian tribal self-governance and congressional intent with regard to each statute.

### B.

■ Funmaker argues that the decision to set fire to the bingo hall was a valid exercise of police power, which he properly implemented. If indeed 18 U.S.C. 844(i) and 18 U.S.C. 924(c) reach Indian tribes, the fact that Funmaker was following the orders of tribal authorities does not immunize him from federal prosecution. Most recently in the public eye, that argument was rejected when those involved in the Iran–Contra scandal were prosecuted. *See United States v. North*, 910 F.2d 843, 926 (D.C.Cir.1990) (concurring in part and dissenting in part) ("our criminal law does not recognize a 'following orders' or 'Nuremberg' defense."). It must be clear that defendants cannot circumvent federal prosecution by claiming that they were merely following orders.

Because the government is entitled to prosecute individuals who follow orders to violate federal law, the next logical step is to ask whether the statutes Funmaker conceded he violated extend to members of Indian tribes. The first issue is whether 18 U.S.C. § 844(i) and 18 U.S.C. § 924(c) invade "exclusive rights of self-governance in purely intramural matters ...." *Coeur d'Alene*, 751 F.2d at 1116. Without addressing the question of whether the decision to set ablaze tribal property involves exclusive rights of self-governance, we hold that Funmaker's actions extended beyond purely intramural matters.

■ The primary statute at issue, 18 U.S.C. § 844(i), applies to the damaging or destroying of property used in or affecting interstate or foreign commerce only. One need look no further than the Constitution to see that the federal government has a unique interest in the protection of goods in interstate commerce. *See U.S. Const.* art. I, § 8, cl. 3 (Commerce Clause). Indian tribes, like states, have no incentive to analyze how their decisions would affect federal interests. Even if Indian tribes had the same enforcement options available as the federal government,[2] tribal leaders could not always be expected to exercise those options similarly.

Funmaker never contested that the gambling hall was used in or affected interstate commerce. Instead, Funmaker relies on the fact that the bingo hall was on tribal property and was involved in a tribal dispute. Given the long reach of the Commerce Clause, however, that reliance is misplaced. If Ollie's Barbecue, a Birmingham restaurant that served no interstate travellers but purchased food that had moved through interstate commerce, was sufficiently involved in interstate commerce to fall within federal jurisdiction, a bingo hall and casino designed to attract tourists from surrounding states undeniably affects interstate commerce for Commerce Clause purposes. *See Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

---

**2.** In fact, they do not; tribal courts may impose penalties limited to six months imprisonment

and/or a $500 fine. 25 U.S.C. § 1302.

Upon deciding that the district court properly had jurisdiction under Section 844(i), jurisdiction pursuant to Section 924(c) necessarily follows. The district court imposed an additional, if insignificant, sentence pursuant to Section 924(c), for use of a destructive device in connection with a crime of violence prosecutable in a United States court. As previously explained, Section 844(i) must extend to Indian tribes, and Funmaker therefore was prosecutable in a United States court. Completing the syllogism, given that the underlying crime of violence proscribed by Section 844(i) is prosecutable in a United States court, the district court properly had jurisdiction over Funmaker to entertain his guilty plea for violating Section 924(c), the use of a destructive device in connection with a crime of violence prosecutable in a United States court.

The conclusion that the district court properly had jurisdiction under both Section 844(i) and Section 924(c) should not constitute a major setback to Indian tribal self-governance. The Winnebago Tribe was no stranger to more conventional means of conflict resolution, as followers of Chairperson Jones recently had completed successful litigation in Federal District Court against Jenna Corporation requiring it to remove its property from the Bingo Hall and cease its management services by 4:30 p.m. on January 26, 1992. If Chairperson Jones feared that Jenna Corporation and Six Pac were planning on violating the injunction, she could have sought emergency relief from the district court. The decision-making power of Indian tribes ends, however, at the point when those decisions would violate federal law designed to safeguard important federal interests such as the free flow of interstate commerce.

## C.

■ Funmaker next argues that Congress did not intend to subordinate the police power of the Winnebago tribe to the Organized Crime Control Act of 1970, the act in which Section 844(i) is codified. Funmaker accurately points out that the legislative history of the Organized Crime Control Act is silent as to its applicability to Indian tribes. Not surprisingly, much of the legislative history of the Organized Crime Control Act focuses on problems created by organized crime.

To conclude from congressional silence that the Organized Crime Control Act does not apply to Indian tribes, however, is a quantum leap we will not undertake. As we noted previously, only when a law interferes with rights guaranteed to Indian tribes by treaty or statute, or when a law would affect rights essential to tribal self-governance in intramural matters, must congressional intent to interfere with those rights be specific and clear. *Smart*, 868 F.2d at 932–34. Funmaker does not allege that rights guaranteed by treaty or statute are at issue, and the interstate commerce implications of Funmaker's actions led to our conclusion that Section 844(i) does not affect rights essential to self-governance in intramural matters. In such a case, this court will assume that laws of general applicability apply to Indian tribes barring legislative history that clearly indicates congressional intent to except Indian tribes.

As Funmaker pointed out, the legislative history of the Organized Crime Control Act says nothing regarding Indian tribes. As a result, we must conclude that Section 844(i) applies to members of those tribes. If the Winnebago Tribe or any other Indian tribes truly believe that certain federal laws fail to consider situations unique to Indian tribes, those tribes may take their cases before Congress.

## D.

■ Funmaker's final two arguments, that federal prosecution of him violates the political question and act of state doctrines, can be dispatched easily. The political question doctrine, which arose from separation of powers concerns, precludes as nonjusticiable consideration of cases in which there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Funmaker contends that the decision by Chairperson Jones to destroy the bingo hall somehow raises a political question.

We cannot agree. The fact that Chairperson Jones' decision was made while exercising her executive power, a political decision to be sure, does not necessitate the conclusion that the decision constitutes a nonjusticiable political question. The prosecution of a member of an Indian tribe under a statute that applies to members of that tribe is perfectly consistent with the separation of powers among the three branches of the federal government. Congress has plenary power over Indian affairs under the Constitution, *U.S. Const.* art. I, § 8, cl. 3, and this court has the power to interpret whether Congress was exercising that power in enacting a law of general applicability. Once we have determined that a law of general applicability applies to Indian tribes, the judiciary must entertain all prosecutions by the executive branch undertaken pursuant to that law. Because we have held that Section 844(i) and Section 924(c) apply to Indian tribes, principles of separation of powers do not preclude jurisdiction, but rather require it.

 Lastly, Funmaker contends that the government prosecuted him in violation of the act of state doctrine. That doctrine dictates that courts will not sit in judgment on the acts of another country done within that country's territory. *See Antolok v. United States,* 873 F.2d 369, 384 (D.C.Cir. 1989). Courts apply the act of state doctrine if deciding a case "might frustrate the conduct of foreign relations by the political branches of the government...." *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767–68, 92 S.Ct. 1808, 1813–14, 32 L.Ed.2d 466 (1972).

This case raises no such possibility. Courts long have held that Indian tribes are not foreign states for jurisdictional purposes. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 19, 8 L.Ed. 25 (1831). Congress can limit the sovereignty enjoyed by Indian tribes, and Section 844(i) and Section 924(c) constitute precisely such limitations. Rather than frustrating congressional policy regarding the Indian tribes, the district court furthered that policy by allowing the government to prosecute Funmaker. The act of states doctrine simply does not apply to Indian tribes.

### III. CONCLUSION

Neither Section 844(i) nor Section 924(c) interfere with tribal rights of self-government in purely intramural matters, and Congress expressed no intent to exclude Indian tribes from those laws of general applicability. Additionally, despite the assertions of Funmaker, the political question and act of state doctrines have no applicability to this case. The district court properly had jurisdiction, and its decision must be

AFFIRMED.