UNITED STATES of America, Plaintiff–Appellee,

v.

Patricia M. BRISK, Lucy A. Beauprey, Isabel M. Cloud, Leona Sanapaw, Barbara Wheelock, James B. Brisk, Jr., and Mary Jane Denny, Defendants–Appellants.

Nos. 97–1298, 97–1325, 97–1829, 97–2059, 97–2581, 97–4006 and 98–1301.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1998.[1]

Decided March 23, 1999.

---

1. Appeals Nos. 97–1298, 97–1325, 97–1829, and 97–4006 were submitted for decision without argument.

Thomas P. Schneider (submitted), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in Nos. 97–1298, 97–1325, 97–1829 and 97–4006.

Mario Gonzales (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No. 97–2059.

Karine Moreno–Taxman, Mario Gonzales (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No. 97–2581.

Thomas P. Schneider, Mario Gonzales (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No. 98–1301.

Patrick K. Cafferty, Racine, WI, Patricia M. Brisk, Lexington, KY, for Defendant–Appellant Brisk.

Robert J. Palmer, May, Oberfell & Lorber, South Bend, IN, Lucy A. Beauprey, Lexington, KY, for Defendant–Appellant Beauprey.

Kathleen T. Zellner, Zellner & Associates, Naperville, IL, for Defendant–Appellant Cloud.

Catherine M. Canright (argued), Superior, WI, for Defendant–Appellant Sanapaw.

Edward John Hunt (argued), Milwaukee, WI, for Defendant–appellant Wheelock.

Christopher Lowe, Milwaukee, WI, James B. Brisk, Jr., Pekin, IL, for Defendant–Appellant Brisk, Jr.

Robert J. Dvorak (argued), Milwaukee, WI, for Defendant–Appellant Denny.

Before CUMMINGS, BAUER, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

This is a consolidated appeal by seven defendants convicted of assorted drug offenses. They contend, *inter alia*, that (1) the district court lacked subject matter jurisdiction over their case, (2) the prosecutor's use of peremptory challenges was discriminatory, and (3) the prosecutor deprived them of a fair trial by making improper comments during his closing argument. We affirm each of the challenged convictions and sentences.

## I. BACKGROUND

On the Menominee Reservation near Green Bay, Wisconsin, drug trafficking was a family affair. All seven of the defendants whose appeals were consolidated in this case are members of the same family. Patricia M. Brisk ("Brisk"), Isabel M. Cloud ("Cloud"), Leona Sanapaw ("Sanapaw"), and Barbara Wheelock ("Wheelock") are sisters. James B. Brisk, Jr. ("Brisk, Jr."), and Lucy A. Beauprey ("Beauprey") are Brisk's children. Mary Jane Denny ("Denny") is Brisk's niece.

On October 24, 1995, a grand jury for the Eastern District of Wisconsin returned an indictment charging the appellants, as well as several others, with numerous drug-related offenses. In an unrelated case, on April 26, 1996, the government filed a sealed juvenile information against Brisk, Jr., charging him with engaging in a sexual act with a person incapable of declining participation, in violation of 18 U.S.C. §§ 2, 1153, 2242(2)(B).

Pursuant to separate plea agreements, Beauprey, Brisk, and Brisk Jr. each pled guilty to one count of conspiracy to distribute and possession with intent to distribute cocaine, and one count of conspiracy to distribute and possession with intent to distribute marijuana, both in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2. Brisk, Jr. also pled guilty to the charge in the juvenile information.

The remaining appellants elected to proceed to trial before a jury. During jury selection, which began on October 28, 1996, the government exercised four of its six peremptory challenges to remove women from a venire that consisted of eighteen women and thirteen men. Several defendants objected that the government's use of peremptories was discriminatory. However, the judge did not rule on the issue until after the trial was over.

At trial, several witnesses testified to numerous drug transactions that involved the appellants. The evidence showed that cocaine was purchased in Milwaukee, Chicago, and northern Illinois and brought to the reservation. It was then packaged at the homes of various defendants. During his closing argument, the prosecutor asserted that drugs had been packaged in front of the young children of some of the defendants. The defendants objected that there was no evidence that the children had been present. The district judge instructed the jury to rely on its own recollection of the evidence and to disregard any comments that weren't supported by the evidence.

On November 6, 1996, a jury found that Cloud, Denny, Sanapaw, and Wheelock were each guilty of one count of conspiracy to distribute and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2. In addition, the jury found that Wheelock was guilty of five counts of knowingly and intentionally distributing cocaine, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. Appellants' sentences are reflected in the following chart:

| Appellant | Term of Imprisonment | Supervised Release |
|---|---|---|
| Beauprey | 84 mo. | 4 yr. |
| Brisk | 115 mo. | 3 yr. |
| Brisk, Jr. | 112 mo. | 3 yr. |
| Cloud | 97 mo. | 4 yr. |
| Denny | 78 mo. | 4 yr. |
| Sanapaw | 97 mo. | 4 yr. |
| Wheelock | 125 mo. | 8 yr. |

Appellants raise three principal issues on appeal. First, Cloud, Denny, Sanapaw, and Wheelock argue that the district court lacked subject matter jurisdiction over their cases. Second, Denny and Wheelock argue that the government violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using peremptory challenges to discriminatorily strike women from the venire. Third, Cloud, Denny, Sanapaw, and Wheelock argue that the prosecutor deprived them of a fair trial by making improper and prejudicial comments during his closing argument. Sanapaw and Cloud raise additional issues. Attorneys for Beauprey, Brisk, and Brisk, Jr. seek to withdraw and have each filed an Anders Brief contending that there are no non-frivolous grounds for appeal. In accordance with Circuit Rule 51(a), Beauprey, Brisk, and Brisk, Jr. were informed of their attorneys' motions and each took advantage of the opportunity to respond.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

 Cloud, Denny, Sanapaw, and Wheelock claim that the lower court lacked subject matter jurisdiction over their cases. They argue that neither the Federal Enclave Act, 18 U.S.C. § 1152, nor the Major Crimes Act, 18 U.S.C. § 1153, gave the court jurisdiction, and that these two statutes are the only sources of federal jurisdiction over crimes committed in Indian country. We review the district court's determination of subject matter jurisdiction *de novo*.

The Federal Enclave Act extends federal enclave laws, i.e., "laws where the situs of the offense is an element of the crime," *United States v. Begay*, 42 F.3d 486, 498 (9th Cir.1994), to Indian country. 18 U.S.C. § 1152. However, the Enclave Act further provides that enclave laws "shall not extend [*inter alia*] to offenses committed by one Indian against the person or property of another Indian." [2] *Id.* In *Ex Parte Crow Dog*, the Supreme Court ruled that this intra-Indian exception precluded a district court from exercising subject matter jurisdiction over a murder case in which the Indian defendant had been charged under a federal enclave law. 109 U.S. 556, 562, 3 S.Ct. 396, 400, 27 L.Ed. 1030 (1883). In an attempt to allay the public concern aroused by *Crow Dog*, Congress enacted the Major Crimes Act, 18 U.S.C. § 1153, which excludes enumerated crimes from the Enclave Act's intra-Indian exception.[3] *Keeble v. United States*, 412 U.S. 205, 209, 93 S.Ct. 1993, 1996, 36 L.Ed.2d 844 (1973).

 Taken together, the Enclave Act and the Major Crimes Act create a two-

---

2. The full text of the Enclave Act is as follows: Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.
18 U.S.C. § 1152.

3. The Major Crimes Act provides that:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A [sexual abuse], incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title [embezzlement and theft] within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. 18 U.S.C. § 1153(a).

part inquiry for determining whether a federal court has subject matter jurisdiction over an enclave law case: first, the court must decide whether the case falls within the intra-Indian exception; and second, if it does, the court must decide whether the Major Crimes Act operates to take the case back out of the exception. *See Negonsott v. Samuels*, 507 U.S. 99, 102, 113 S.Ct. 1119, 1121, 122 L.Ed.2d 457 (1993) (explaining how the two statutes work together). Appellants contend that their case falls within the intra-Indian exception because they are Indians who have been charged with committing offenses "against the person or property of another Indian." Furthermore, they point out that the Major Crimes Act does not exclude either conspiracy or controlled substance offenses from the intra-Indian exception. Therefore, they conclude that neither statute provides subject matter jurisdiction over their case.

■ We agree that neither statute provides jurisdiction, but for a different reason—the Enclave Act and the Major Crimes Act are inapposite. Both statutes deal exclusively with federal enclave laws, but enclave laws are not at issue in this case. Every circuit to consider the issue has held that the Enclave Act and Major Crimes Act do not control subject matter jurisdiction in non-enclave law cases. *See, e.g., United States v. Yannott*, 42 F.3d 999, 1004 (6th Cir.1994); *United States v. Wadena*, 152 F.3d 831, 841 (8th Cir.1998); *Begay*, 42 F.3d at 498. *See also* Richard W. Garnett, *Once More into the Maze: United States v. Lopez, Tribal Self-Determination, and Federal Conspiracy Jurisdiction in Indian Country*, 72 N.D.L.Rev. 433, 458 (1996) ("The circuit courts agree that the [Enclave Act's] exceptions for in-tra-Indian crimes . . . apply only to federal enclave laws, and they agree that the Major Crimes Act merely abrogates the [Enclave Act's] intra-Indian exception for the enumerated crimes."). It is also clear that the two statutes are not the only sources of federal jurisdiction over crimes committed in Indian country. *See, e.g., Wadena*, 152 F.3d at 840 (rejecting claims "that the only crimes that may be the basis for federal court jurisdiction are those within the [Enclave Act] and the Indian Major Crimes Act"). Thus, we must look elsewhere to determine whether a district court has federal jurisdiction over a non-enclave law case such as this one.[4]

■ We begin with the general proposition that "statutes written in terms applying to all persons include members of Indian tribes as well." *United States v. Funmaker*, 10 F.3d 1327, 1330 (7th Cir. 1993) (citing *FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960)). *See also United States v. Wheeler*, 435 U.S. 313, 331 n. 30, 98 S.Ct. 1079, 1090 n. 30, 55 L.Ed.2d 303 (1978) ("Federal jurisdiction . . . extends . . . to crimes over which there is federal jurisdiction regardless of whether an Indian is involved."). However, because of the "unique status of Indians as 'a separate people' with their own political institutions," *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977), we do not apply laws of general applicability "when the application of a statute would affect Indian or tribal rights recognized by treaty or statute, or would affect rights essential to self-governance of intramural matters [unless] the law specifically . . . evince[s] Congressional intent to interfere with those rights," *Funmaker*, 10

4. The distinction between enclave laws and federal laws of nationwide applicability is based on the notion that enclave laws "define traditional state law crimes . . . and then apply them to federal enclaves by making the situs of the crime one of its elements." Garnett, 72 N.D.L.Rev. at 445. Thus, while enclave laws are conceived to fill traditionally state law roles, generally applicable federal laws implicate national interests. As the Ninth Circuit reasoned in *United States v. Burns*, "[j]ust as state law is not to apply on Indian lands, unless expressly authorized by federal statute, so also, federal enclave law is not to apply unless expressly authorized." 529 F.2d 114, 117 (9th Cir.1975).

F.3d at 1330–31.[5] Thus, we begin with the premise that the district court properly exercised jurisdiction over these non-enclave law offenses, and inquire whether enforcement of the drug laws will impermissibly affect the rights of the Menominee Indians.

Appellants contend that Menominee rights under the Wolf River Treaty of 1854, 10 Stat. 1064, are in jeopardy. They argue that the treaty's promise to the Menominee of a reservation "for a home, to be held as Indian lands are held," art. 2, 10 Stat. at 1065, implies that the internal affairs of the Menominee will always remain exclusively within the jurisdiction of their tribal government. In support of this argument, they cite *Menominee Tribe of Indians v. United States*, in which the Supreme Court read the Wolf River Treaty broadly, holding that "the language 'to be held as Indian lands are held' includes the right to fish and to hunt." 391 U.S. 404, 406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968). The Court reasoned that "[t]he essence of the Treaty of Wolf River was that Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life." *Id.* Even under a broad reading of the treaty, however, the interpretation urged by Appellants is simply too much of a stretch.

Nor do we believe that federal drug laws impermissibly impinge on Menominee rights essential to self-governance of intramural matters. While it is well established that Indians have a right to self-government that "includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions," *Wheeler*, 435 U.S. at 322, 98 S.Ct. at 1085 (internal citations omitted), this right

is limited in that a tribal court may "in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and a fine of $5,000, or both," 25 U.S.C. § 1302(7). In fact, according to Appellants, the penalties for controlled substance violations under Menominee law are: a $1000 to $5000 fine, not more than a year in jail, both a fine and jail time, or a $1000 fine and banishment from the reservation for one to five years. Ordinance No. 80–17. As the Eighth Circuit remarked, "[i]n limiting tribal punishment powers to relatively mild penalties, Congress must have assumed that Indians on reservations would generally be subject ... to federal criminal sanctions which apply to all persons." *United States v. Blue*, 722 F.2d 383, 386 (8th Cir.1983). Thus, the right to enact and enforce criminal laws does not include the exclusive right to do so. Furthermore, even if exclusive jurisdiction were a right essential to self-governance, drug conspiracies are not purely intramural matters. The federal government has a significant interest in nationwide enforcement of its anti-drug laws. For these reasons, we hold that enforcement of federal drug laws on the Menominee Reservation does not impermissibly affect the rights of the Menominee Indians.

As a final matter, we must address the apparent conflict between this opinion and *United States v. Quiver*, in which the Supreme Court held that a federal court did not have jurisdiction over an adultery prosecution that was brought under a statute of general applicability. 241 U.S. 602, 603, 36 S.Ct. 699, 700, 60 L.Ed. 1196 (1916). *Quiver* is distinguishable from this case (and from the numerous decisions

5. While our holding in *United States v. Smith* indicated that federal jurisdiction in that case rested on the existence of a peculiarly federal crime, 562 F.2d 453, 458 (7th Cir.1977), our more recent decision in *Funmaker* demonstrates that a peculiarly federal interest is not a prerequisite for federal jurisdiction. While we did consider the federal government's unique interest in the protection of goods in interstate commerce in *Funmaker*, we did so only in the context of determining whether the conduct at issue extended beyond purely intramural matters. 10 F.3d at 1331. Thus, while the existence of a peculiarly federal interest is relevant in determining whether a matter is purely intramural, no uniquely federal interest is needed to support federal jurisdiction.

that have upheld federal jurisdiction over cases involving statutes of general applicability[6]) in that it involved adultery. The Court in *Quiver* reasoned that since matters such as adultery have always "been left to the tribal customs and laws," the federal adultery statute should not apply to Indians. *Id.* at 605, 36 S.Ct. at 700. We agree with the Eighth Circuit that because "Quiver ... concerned a prosecution for adultery, deemed to be an internal and social tribal matter ... [it] has not been read to preclude federal prosecutions under general criminal federal statutes not involving such matters." *Blue,* 722 F.2d at 386. Furthermore, we are not persuaded to the contrary by the Court's statement in *Quiver* that "the enumeration ... [in the Major Crimes Act] of certain offenses as applicable to Indians in the reservations, carries with it some implication of a purpose to exclude others." 241 U.S. at 606, 36 S.Ct. at 701. This statement is consistent with our holding that the Major Crimes Act excludes unenumerated *enclave law offenses* from application in Indian country in intra–Indian situations.[7]

## B. Jury Selection

■ We next consider Denny and Wheelock's contention that the government violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), when it used four of its six peremptory challenges to remove women from the venire during jury selection. In *Batson,* the Supreme Court held that the discriminatory exercise of peremptory challenges violates the Fourteenth Amendment's Equal Protection Clause. 476 U.S. at 89, 106 S.Ct. at 1719. Although *Batson* dealt only with race discrimination, the Court subsequently held, in *J.E.B.,* that gender discrimination in the use of peremptory challenges also violates the Fourteenth Amendment. 511 U.S. at 129, 114 S.Ct. at 1421. These holdings apply to jury selection in federal courts under the Due Process Clause of the Fifth Amendment, which "includes a guarantee of equal protection parallel to that of the Fourteenth Amendment." *United States v. Barry,* 71 F.3d 1269, 1271 (7th Cir.1995). *See also United States v. Hughes,* 970 F.2d 227, 230 (7th Cir.1992) (holding that the dictates of *Batson* "extend[ ] to the federal government through the Due Process Clause of the Fifth Amendment").

■ *Batson* set forth a three step method for determining whether a party has exercised a peremptory challenge discriminatorily. First, the party alleging a violation must make a prima facie showing of intentional discrimination. Second, once this showing has been made, the burden shifts to the party that exercised the challenge to articulate a gender-neutral explanation for the challenge. Finally, the trial judge must decide whether the reasons offered are pretextual and whether the party alleging a violation has met its burden of proving purposeful discrimination. *See Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1723–24; *J.E.B.,* 511 U.S. at 144–45, 114

---

6. *See, e.g., Funmaker,* 10 F.3d 1327; *Smith,* 562 F.2d 453; *United States v. Three Winchester 30–30 Caliber Lever Action Carbines,* 504 F.2d 1288 (7th Cir.1974); *United States v. Boots,* 80 F.3d 580 (1st Cir.1996); *Yannott,* 42 F.3d 999; *Wadena,* 152 F.3d 831; *Blue,* 722 F.2d 383; *Stone v. United States,* 506 F.2d 561 (8th Cir.1974); *United States v. McGrady,* 508 F.2d 13 (8th Cir.1974); *United States v. Juvenile Male,* 118 F.3d 1344 (9th Cir.1997); *Begay,* 42 F.3d 486; *United States v. Young,* 936 F.2d 1050 (9th Cir.1991); *United States v. Strong,* 778 F.2d 1393 (9th Cir. 1985); *United States v. Top Sky,* 547 F.2d 483 (9th Cir.1976); *Burns,* 529 F.2d 114; *Walks*

on Top v. United States, 372 F.2d 422 (9th Cir.1967).

7. A similar argument can be made about the Court's statement in a footnote of *Antelope* that "[e]xcept for the offenses enumerated in the Major Crimes Act, all crimes committed by enrolled Indians against other Indians within Indian country are subject to the jurisdiction of tribal courts." 430 U.S. at 643 n. 2, 97 S.Ct. at 1397 n. 2. The Court's reference to "all crimes" likely meant all *enclave law* crimes.

S.Ct. at 1429. In this case, the district judge ruled that Appellants had failed to make a prima facie showing of gender discrimination.

■ We have recently held that "[u]nlike the ultimate issue of discriminatory intent, which as a factual question is entitled to deferential review, the preliminary question of whether a prima facie case has been shown presents a mixed question of law and fact which the appellate courts should review *de novo*." *Mahaffey v. Page*, 162 F.3d 481, 484 (7th Cir.1998) (internal citations omitted). A *de novo* standard is appropriate because "[t]he question of whether an inference of discrimination may be drawn from a set of undisputed facts relating to the ... make-up of the jury venire and the prosecutor's exercise of peremptory challenges is ... one over which the appellate courts should exercise a degree of control that a clear error standard would not afford." *Id.* Accordingly, because the facts before us are undisputed, we review *de novo*.

To establish a prima facie case of gender discrimination in the exercise of a peremptory challenge, Denny and Wheelock needed to show that the government struck a member of a constitutionally protected class, and that all the relevant circumstances raised an inference of intentional discrimination. *See United States v. Cooper*, 19 F.3d 1154, 1159 (7th Cir.1994). Relevant circumstances include the pattern of strikes, and the prosecutors' questions and statements. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. Since *J.E.B.*, it is indisputable that women are a constitutionally protected class for the purposes of jury selection. Therefore, the only issue before us is whether all the relevant circumstances raised an inference of intentional gender discrimination.

Denny and Wheelock urge that the government's use of four of its six peremptory challenges to remove women from the venire constituted a pattern of strikes against women. We disagree. In *McCain v. Gramley*, we held that a pattern of strikes can be demonstrated "by the manner in which a party uses its strikes as compared to its total strikes or to the total number of members of the ... [protected] group." 96 F.3d 288, 291–92 (7th Cir. 1996). In this case, the venire consisted of eighteen women and thirteen men. The government neither used a significant number of its total strikes to remove women, nor did it remove a significant number of the women on the venire. While we recognize that "the right to nondiscriminatory jury selection procedures belongs to the potential jurors, as well as to the litigants ... [and that] [t]he exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system," *J.E.B.*, 511 U.S. at 142 n. 13, 114 S.Ct. at 1428 n. 13, the fact that the government used four peremptory challenges to remove women from the venire, without more, simply does not raise an inference of intentional discrimination.

■ On another note, Denny and Wheelock contend that the district court abused its discretion by failing to rule on their *Batson* challenge until the trial was over. They argue that by doing so, the court put off the decision until a point in the proceedings when the only remedy would have been to retry the entire case. Because Denny and Wheelock did not establish a prima facie *Batson* violation, the issue is moot. However, we feel compelled to note that although *Batson* did not "formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges," *Batson*, 476 U.S. at 99, 106 S.Ct. at 1724–25, we agree with the Fourth Circuit that delaying a *Batson* ruling until the end of trial is ill-advised. *United States v. Joe*, 928 F.2d 99, 103 (4th Cir.1991). When a new trial must be granted because of an untimely *Batson* decision, the error imposes "an additional and unnecessary expenditure of judicial and litigant resources since a new trial could have been avoided by a timely decision." *Id.*

## C. Closing Argument

The last of the three principal arguments on appeal concerns the prosecutor's comments during his closing argument. Cloud, Denny, Sanapaw, and Wheelock contend that several of the prosecutor's statements were improper and prejudicial and, therefore, deprived them of a fair trial in violation of their due process rights. We review the district judge's refusal to grant a mistrial for abuse of discretion. As we have said before, "[h]aving watched the jury as they listened to the testimony, having listened to the testimony and the arguments himself, having his finger as it were on the pulse of the trial ... the district judge was in a better position than we to weigh the imponderables involved in a judgment of prejudice." *United States v. Williams*, 81 F.3d 1434, 1440 (7th Cir.1996). *See also United States v. Henry*, 2 F.3d 792, 794 (7th Cir.1993).

To decide whether a prosecutor's comments have deprived a defendant of a fair trial, "we first look at the disputed remarks in isolation to determine if they are proper." *United States v. Cotnam*, 88 F.3d 487, 498 (7th Cir.1996). *Accord United States v. Kelly*, 991 F.2d 1308, 1315 (7th Cir.1993). If the remarks are determined to be improper, we "consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial." *Cotnam*, 88 F.3d at 498. *Accord Kelly*, 991 F.2d at 1315. Only one of the statements challenged by Appellants merits discussion. During his closing argument, the prosecutor asked: "Did they have small children in the house? Yes. Did they choose to have drugs packaged in their houses while those children were there? Yes." (Tr. Supp. R. vol. 1 at 106.) The government concedes that there was no evidence that children were present while cocaine was being packaged; and the argument that the presence of children can be inferred from the fact that some of the defendants had small children is simply too farfetched. There is no doubt in our minds that this comment was an improper attempt to argue facts not in evidence. *See Henry*, 2 F.3d at 795 ("It is fundamental that counsel cannot rely or comment on facts not in evidence during closing argument."). Thus, the only real issue is whether the comment so infected the process as to deprive Appellants of their due process right to a fair trial.

In determining whether improper remarks are prejudicial enough to deprive a defendant of a fair trial, we consider the following five factors: "1) the nature and seriousness of the prosecutorial misconduct, 2) whether the prosecutor's statements were invited by impermissible conduct by defense counsel, 3) whether the trial court instructed the jury to disregard the statements, 4) whether the defense was able to counter the improper statements through rebuttal, and 5) the weight of the evidence against the defendant." *Cotnam*, 88 F.3d at 498. *Accord Kelly*, 991 F.2d at 1315. In this case, there was no chance for the defense to refute the statements, since they were made during the prosecution's rebuttal. Furthermore, the comments were not invited by any impermissible conduct on the part of the defense. However, the rest of the factors weigh against granting a new trial. The prosecutor's comments, while ill-advised and wrong, were not outrageous. They did not relate to the guilt or innocence of the defendants, they simply sought to convince the jury of the seriousness of the crime. In addition, the evidence against the defendants was strong. Finally, the judge told the jurors to rely on their own recollection of what the evidence showed and to disregard any comments not supported by the evidence. (Tr. Supp. R. vol. 1 at 107.) Although it would have been preferable for the judge to instruct the jury to disregard the specific comments, the judge's admonishment was sufficient to mitigate any possible prejudice that may have arisen from the comments. *See Henry*, 2 F.3d at 795 n. 1, 796 (noting the district judge's admonishment that "argu-

ments and statement by the lawyers for the parties are not evidence ... if the facts as you remember them differ from the way the lawyers have characterized them, it is your memory that controls," and holding that "[a]ny potential prejudice was adequately cured by the district court's instructions to the jury"); *Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (instruction that arguments of counsel are not evidence and that jury should make decision on basis of evidence alone). Thus, Appellants were not deprived of a fair trial, and the district judge did not abuse his discretion in refusing to grant a mistrial. *See Kelly*, 991 F.2d at 1315 (holding that a defendant had not been deprived of a fair trial despite having no opportunity to rebut an improper comment and not having invited the comment when the comment did not pose a substantial risk of undue prejudice, the evidence against the defendant was strong, and the judge mitigated the prejudice with a curative instruction); *Henry*, 2 F.3d at 795–96 (same).

## D. Additional Issues

■■■ The remaining issues can be quickly disposed of. To begin with, Sanapaw claims that the district judge abused his discretion by allowing witnesses to testify about drug activity that predated the 1994–1995 drug conspiracy. Sanapaw contends that the testimony was irrelevant and, therefore, inadmissable under Federal Rule of Evidence 402. Fed.R.Evid. 402 ("Evidence which is not relevant is not admissible."). Alternatively, she argues that even if the evidence was relevant, it was inadmissible under Federal Rule of Evidence 403 because it was unfairly prejudicial.[8]

Neither of these arguments is persuasive. Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. This is not a difficult standard to meet. Thus, we cannot say that the district judge abused his discretion in finding that the evidence of past drug activity, often involving co-conspirators, tended to make the existence of *some* fact of consequence (such as knowledge of how to sell drugs or acquaintance with co-conspirators) more likely. Furthermore, we agree with the district judge that the testimony was not barred by Rule 403, which states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues...." Fed.R.Evid. 403. In this case, the danger of unfair prejudice was minimal because the testimony at issue was insignificant in comparison to the overwhelming evidence against Sanapaw. *See United States v. Molinaro*, 877 F.2d 1341, 1346 (7th Cir.1989). In addition, the testimony had significant probative value in that it enabled the government to give a more complete picture of the events leading up to the formation of the conspiracy. For these reasons, the district judge was well within his discretion in admitting the testimony and in subsequently refusing to grant a mistrial.

■■■ Sanapaw next argues that there was insufficient evidence to support her conviction. In particular, she contends that the government failed to prove beyond a reasonable doubt that a "participatory link" existed between her and the conspiracy. In making this sufficiency challenge, Sanapaw "faces a nearly insurmountable hurdle ... [in that] we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no

---

8. On appeal, Sanapaw has not raised Federal Rule of Evidence 404(b), which states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Therefore, any arguments relying on this rule have been waived.

**526**

evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997) (internal quotation marks and citations omitted). Furthermore, in evaluating the evidence, "we need not limit our search to direct evidence [because c]onspiracies ... may be proved entirely by circumstantial evidence." *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991).

 To establish a participatory link, the prosecutor was required to show that "the defendant knew of the conspiracy and that [s]he intended to join and associate h[er]self with its criminal design and purpose." *United States v. Jean*, 25 F.3d 588, 596 (7th Cir.1994) (internal quotation marks and citations omitted). There was ample evidence to support such a conclusion. Most significantly, Monty Beauprey, a co-conspirator, testified that Sanapaw was typically given a baggie containing five hundred dollars worth of cocaine without being required to pay for it. (Tr. vol. 11 at 40.) After she sold the cocaine, Sanapaw was required to give about four hundred dollars back to Brisk (although sometimes Sanapaw was paid in drugs rather than in money). (Tr. vol. 11 at 41.) Based on this and other testimony, the jury could have found that a participatory link had been proven beyond a reasonable doubt.

 Sanapaw's last argument concerns her sentence. Specifically, she contends that the district judge erred in finding her responsible for 4 kilograms of cocaine because the evidence shows only that she was responsible for 2.87 kilograms. At stake is a two level reduction in Sanapaw's base offense level (from 30 to 28). U.S.S.G. § 2D1.1(a)(3), & (c)(5),(6). We review a judge's attribution of drugs for clear error.

 During the sentencing phase of a trial, the government has the burden of proving the amount of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Rosa*, 946 F.2d 505, 509 (7th Cir.1991). In this case, the district court found that the government had met its burden by relying on the testimony of several co-conspirators, including Monty Beauprey, Kim Tourtillot, and Rosa Crowe. Although she does not explicitly say so, Sanapaw appears to part ways with the government and the district court only insofar as she rejects the testimony of Monty Beauprey as unreliable. However, the district judge specifically found that nothing in Monty Beauprey's testimony was "false or inaccurate," (Tr. vol. 23 at 15), and that his testimony was not "embellished such that the court ought to discount [it]," (Tr. vol. 23 at 16). Such credibility evaluations by a district judge are given the utmost deference, *United States v. Magana*, 118 F.3d 1173, 1205 (7th Cir. 1997), and Sanapaw has given us no reason to disturb this one. Thus, we hold that there was no clear error.

 The final issue on appeal also relates to sentencing. Cloud claims that the district judge erred in refusing to grant her a two level reduction, under U.S.S.G. § 3B1.2(b), for her minor participation in the conspiracy. Such a reduction is meant for a person "who is less culpable than most other participants." U.S.S.G. § 3B1.2, Application Note 3. It was Cloud's burden to show by a preponderance of the evidence that she was entitled to the reduction. *United States v. Soto*, 48 F.3d 1415, 1423 (7th Cir.1995). We review the district judge's determination that she did not meet this burden for clear error.

In support of her argument, Cloud points out that she did not procure drugs for the conspiracy, went along on only one drug run, and sold drugs less frequently than other co-conspirators. Her principal role in the conspiracy consisted of preparing the bindles in which the cocaine was packaged. Thus, she concludes that she was less culpable than most other participants in the conspiracy and was entitled to an offense level reduction. Cloud's argu-

ment is unpersuasive because, as we have previously explained, "the fact that one plays a much lesser role than another does not mean that one is a minor participant." *United States v. Kerr,* 13 F.3d 203, 206 (7th Cir.1993). The logic of this rule becomes apparent when one considers the fact that a "boss's trusted secretary through the years is crucial to the enterprise, even where the boss decides everything and gives all the orders." *Id.* In such situations, "the secretary is a lesser participant but not a minor one." *Id.* In this case, the district judge found that Cloud was "an inextricably integral part of the overall activities ... the preparation of wraps, taking phone calls, dealing with covering with who was doing what ... [and that her activities were] all indices of someone who [wa]s very attuned to the whole notion of the extent of the distribution of cocaine on the Menominee Reservation and its environs." (Tr. vol. 14 at 64.) Viewed in this way, the district judge's decision not to grant Cloud a sentence reduction for minor participation was not clearly erroneous.

**E. Anders Briefs and *Pro Se* Motions**

 We come at last to the Anders Briefs submitted by the attorneys for Beauprey, Brisk, and Brisk, Jr. Each brief argues that there are no non-frivolous grounds for appeal and seeks permission for the attorney to withdraw. Since all the Anders briefs are sufficient on their face, we consider only those issues raised in the briefs and the responses to the briefs. *United States v. Wagner,* 103 F.3d 551, 553 (7th Cir.1996). Having carefully reviewed all the materials submitted, we agree with the attorneys that there are no non-frivolous grounds for appeal as to Beauprey, Brisk, and Brisk, Jr. However, as is our practice, we decline to consider the ineffective assistance of counsel claims on direct appeal since determination of such claims requires evidence that is outside the trial record. *United States v. Brooks,* 125 F.3d 484, 495 (7th Cir.1997).

All that remains are the *pro se* motions of Brisk and Brisk, Jr. Brisk requests that she be appointed new counsel to represent her on appeal. Since we have determined that an appeal would be frivolous, she is not entitled to new counsel. For the same reason, Brisk, Jr.'s request for a copy of the full record is also unwarranted.

CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment in all respects. We also GRANT the motions of the attorneys for Beauprey, Brisk, and Brisk, Jr. to withdraw, and DENY Brisk's motion for new appointed counsel and Brisk Jr.'s request for a copy of the full record.